# Richmond

James C. Nance v. Commonwealth of Virginia.

Larry S. Haywood v. Commonwealth of Virginia.

William Thomas Tharp v. Commonwealth of Virginia.

April 23, 1962.

Record Nos. 5424, 5425, 5426.

Present, All the Justices.

*Joseph J. Lawler* (*Kellam & Kellam*, on brief), for the plaintiffs in error.

*D. Gardiner Tyler, Assistant Attorney General (Robert Y. Button, Attorney General, on brief), for the Commonwealth.*

SPRATLEY, J., delivered the opinion of the court.

James C. Nance, Larry S. Haywood and William Thomas Tharp were separately indicted, each charged with the possession of burglarious tools with intent to commit burglary. By agreement of the Commonwealth's Attorney and the accused, the indictments were tried together. The jury, by separate verdicts, found each of the accused guilty, fixing the punishment of Nance and Haywood at seven years each in the penitentiary and that of Tharp at two years. Motions to strike the evidence of the Commonwealth and to set aside the verdicts were overruled. Judgments were entered upon the verdicts, and we granted writ of error in each case.

Defendants contend that the trial court erred in overruling their several motions. Specifically they argue that each verdict is contrary to the law and the evidence. They further claim that the court erred in refusing to grant Instruction D-1.

Section 18.1-87, Code of 1950, 1960 Replacement Volume, provides:

"If any person have in his possession any tools, implements or outfit, with intent to commit burglary, robbery, or larceny, he shall be confined in the penitentiary not less than one nor more than ten years. The possession of such burglarious tools, implements or outfit by any person other than a licensed dealer, shall be prima facie evidence of an intent to commit burglary, robbery or larceny."

The evidence will be set out somewhat in detail, in view of the defendants' contentions.

Detective R. J. Hladky of the Princess Anne County Police Department testified that on the night of January 5, 1961, he received an "alert" concerning a 1955 Plymouth four-door automobile with white top and red body, bearing License No. A-218-310. He knew there had been several burglaries in his county, and also had been informed that James C. Nance was one of the occupants of the car.

Detective D. M. Cox, of the Princess Anne Police, said that when he came to work about 11:00 p. m. on the night of January 5, he "put an alert out to all cars, and described the license number of a car."

K. C. Wood, a police officer of the city of Virginia Beach, while on duty in a patrol car, early on the morning of January 6, near the

rear of two large stores, saw a red and white Plymouth car on Thirty-second street. It contained three occupants, and when he got close to the car, he observed it bore the license number A-218-310. The Plymouth "started out at a rapid speed," running north on Pacific avenue. The officer followed until the car eluded him in the vicinity of the Cavalier Hotel. On the same morning, C. C. Pace, a county officer, saw the Plymouth occupied by the three defendants, near the Thunderbird Bowling Alley. He looked into the front of the car, and saw a fishing rod; but did not look in the back. No light was in the car. He told the occupants that C. E. Currie*, a county officer, wanted to talk to them. No arrest was made, and the defendants left.

Officer Currie, accompanied by Shore Patrol Chief Edward Adams, said he was on patrol duty at Chesapeake Junction, and was looking for the automobile in question. He had a description of the car and its license number. He saw a car enter Route No. 60, and drove close enough to it to note that its license number was A-218-310. The car started off at a high rate of speed to Shore Drive and into Shelton Road, and when it got about fifty yards up Shelton Road, he and Adams saw the right-hand front door of the Plymouth come open, a man's arm reach out, and "an object" dropped out of the door to the roadway. He drove to the object, Adams leaned out of the car, picked it up and found it to be a sledge hammer. They pursued the Plymouth car, with the red light of the police car shining and its siren sounding, for about two and one-quarter miles. The Plymouth was running so fast that the officer drove his car ninety-five miles an hour for part of a distance of three and one-half miles, to catch up with it. He brought the Plymouth to a stop on Bayside Road, after a chase of about four or five minutes.

Tharp was driving the Plymouth, Nance was in the middle of the front seat; and Haywood was on the right side of that seat. Currie and Adams then searched the Plymouth. They found a gas torch lying under the front seat, with the front portion, or nozzle, sticking out. Also found in the car were bar bolt cutters, a flashlight, one Mossberg 12 gauge shotgun, a box of 12 gauge shotgun shells, extra range shotgun shells, four pairs of gloves, drift punch wrecking bar, cold chisel, small bolt cutters, and two pairs of pliers. Some "shells" were found in the pocket of Nance, and a road map in the glove compartment of the car. The shotgun was lying on the back seat.

---

*The name of Officer "Currie" should be "Sorey." Testimony attributed in the record to "Currie" was actually that of "Sorey." The similarity in the sound of the names explains the error.

County Officer P. J. McKinnon soon arrived at the scene. Upon being informed of the chase, the route, and the circumstances with respect to the recovery of the sledge hammer, McKinnon retraced the route of the Plymouth car. Approximately twenty-five yards from where the sledge hammer had been thrown from the Plymouth, in the direction in which it was traveling, he found, on the shoulder of the road, a bag or satchel containing a gas mask, some maps, chisels and a hammer or hatchet. A punch and crowbar were lying nearby. On the shoulder of the road there were found indentations and marks where the sledge hammer struck the earth. McKinnon called County Officer Whitehurst to the scene. Whitehurst saw the bag and the tools described, gathered them up, put them in the trunk of his patrol car, and carried them to police headquarters.

The evidence further showed that the tools were of the character suitable for use and customarily used in the commission of burglaries. The method of their use was described in detail.

On a map found in the bag, the streets were traced with a pencil, with a pencilled arrow pointing towards Van Patten Road, the street on which Nance lived, in the city of Norfolk.

The tools were examined in the laboratory of the Federal Bureau of Investigation. An expert agent of the F. B. I. testified that he there found on the heads of the sledge hammer and hatchet a substance known as "safe insulin," sometimes called "cement deposits," and that this material is used in building safes and not for other purposes. He further said he found other deposits which had the same appearance; but he could not identify them as "safe insulin."

Each of the defendants testified in his own behalf. They said that by pre-arrangement, they had met at the home of Nance about 11:00 o'clock p. m. on January 5, for the purpose of going fishing. Nance stated that he owned the shotgun and shells, and that he used most of the tools found in the car in his work as an employee of a crane service. He said he had never seen the sledge hammer, nor the bag of tools found on the road, the hatchet, gas mask, and other items in the bag, and that they were never in the car. The Plymouth was registered in the name of his wife. He admitted that he had been twice convicted of a felony, one conviction being for statutory burglary.

Tharp said that he drove the automobile rapidly when he saw the police coming behind him, because his operator's permit had been revoked.

Haywood, who was twenty-six years old, admitted that he had been

previously convicted of several felonies, when he was seventeen years old, including "breaking and entering."

Both Tharp and Haywood denied possession or ownership of the tools.

■ The court did not err in refusing to grant Instruction D-1, which reads as follows:

"The Court instructs the Jury that unless you believe from the evidence in this case there is evidence of the commission of the crime of burglary or an attempt to commit the crime of burglary, then the possession of burglarious tools is not sufficient to convict the accused of the crime charged."

The jury was instructed, without objection, in the language of the statute, that the possession by a defendant of burglarious tools, implements or outfit is prima facie evidence of an intent to commit burglary, robbery or larceny. Added were the usual instructions relating to circumstantial evidence and reasonable doubt.

Instruction D-1 is obviously violative of the provisions of Code, § 18.1-87. The possession of burglarious tools by one not a licensed dealer is alone, by the statute, made prima facie evidence of an intent to commit burglary, robbery or larceny. The presumption, however, cuts off no defense nor interposes any obstacle to a contest of the facts, and "relieves neither the court nor the jury of the duty to determine all of the questions of fact from the weight of the whole evidence. 'It is merely a rule of evidence and not the determination of a fact * * *.' When *possession is proven, the burden of going forward with the evidence* shifts to the defendant, but this does not shift the burden of ultimate proof, or deprive defendant of his right to have the jury instructed on the presumption of innocence." *Burnette* v. *Commonwealth*, 194 Va. 785, 790, 791, 75 S. E. 2d 482.

In other words, when a person, other than a licensed dealer, has been shown to have in his possession burglarious tools, the burden of making a reasonable explanation to overcome the statutory presumption is shifted to him,—an explanation sufficiently credible to be accepted by a jury.

■ That the defendants were acting in concert is clear. Their presence in the car, in the middle of the night, with the burglarious tools readily accessible, the quantity and character of the tools, explain the elusive driving of Tharp. The tools could not have been in the car without their knowledge, or thrown from it without their participation in some part. All of this and the circumstances of their flight and their behavior create more than a mere suspicion of guilt.

In addition, the deposits found on the heads of the sledge hammer and the hatchet indicate they had been used to crack a safe. The map found in the satchel, bearing marks leading to the home of one of the defendants, connects him with the offense. The effort to escape by flight at an excessive speed in itself is one of a series of circumstances from which guilt may be inferred. *Duty* v. *Commonwealth*, 137 Va. 759, 119 S. E. 62.

While circumstantial in nature, the evidence was sufficient to justify the jury in finding that it excluded every reasonable hypothesis save that of the guilt of the defendants. Whether or not defendants' explanation of the facts overcame the statutory presumption was for the jury to determine. *State* v. *Smith*, 247 Iowa 500, 73 N. W. 2d 189. Cf. *State* v. *Bryan*, 69 Ohio App. 306, 43 N.E. 2d 625.

The evidence relating to the actions of the defendants, and the deposits found on the sledge hammer and hatchet differentiate this case from *Burnette* v. *Commonwealth*, *supra*, upon which the defendants rely. This is not a case where inferences are founded on inferences; but a case where inferences may be drawn from proven facts.

We are unable to say that the verdicts of the jury are plainly wrong, or without evidence to support them. The judgments based thereon must be affirmed.

*Affirmed.*