# VIRGINIA *v.* BLACK ET AL.

No. 01–1107.   Argued December 11, 2002—Decided April 7, 2003

344

346

O'CONNOR, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III, in which REHN-QUIST, C. J., and STEVENS, SCALIA, and BREYER, JJ., joined, and an opinion with respect to Parts IV and V, in which REHNQUIST, C. J., and STEVENS and BREYER, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 368. SCALIA, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, in which THOMAS, J., joined as to Parts I and II, *post*, p. 368. SOUTER, J., filed an opinion concurring in the judgment in part and dissenting in part, in which KENNEDY and GINS-BURG, JJ., joined, *post*, p. 380. THOMAS, J., filed a dissenting opinion, *post*, p. 388.

*William H. Hurd,* State Solicitor of Virginia, argued the cause for petitioner. With him on the brief were *Jerry W. Kilgore,* Attorney General, *Maureen Riley Matsen* and *William E. Thro,* Deputy State Solicitors, and *Alison P. Landry,* Assistant Attorney General.

*Deputy Solicitor General Dreeben* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General Boyd, Barbara McDowell, Jessica Dunsay Silver,* and *Linda F. Thome.*

*Rodney A. Smolla* argued the cause for respondents. With him on the brief were *James O. Broccoletti, David P. Baugh,* and *Kevin E. Martingayle.**

JUSTICE O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III, and an opinion with respect to Parts IV and V, in which THE CHIEF JUSTICE, JUSTICE STEVENS, and JUSTICE BREYER join.

In this case we consider whether the Commonwealth of Virginia's statute banning cross burning with "an intent to intimidate a person or group of persons" violates the First Amendment. Va. Code Ann. § 18.2–423 (1996). We conclude that while a State, consistent with the First Amendment, may ban cross burning carried out with the intent to intimidate, the provision in the Virginia statute treating any

---

*Briefs of *amici curiae* urging reversal were filed for the State of California by *Bill Lockyer,* Attorney General, *Manuel M. Medeiros,* State Solicitor General, *Richard M. Frank,* Chief Assistant Attorney General, and *Angela Sierra,* Deputy Attorney General; for the State of New Jersey et al. by *David Samson,* Attorney General of New Jersey, and *Carol Johnston,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Janet Napolitano* of Arizona, *Richard Blumenthal* of Connecticut, *Thomas J. Miller* of Iowa, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Jennifer M. Granholm* of Michigan, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Roy Cooper* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Mark L. Shurtleff* of Utah, and *William H. Sorrell* of Vermont; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger.*

Briefs of *amici curiae* urging affirmance were filed for the Council of Conservative Citizens by *Edgar J. Steele;* for the Rutherford Institute by *John W. Whitehead* and *Steven H. Aden;* and for the Thomas Jefferson Center for the Protection of Free Expression by *Robert M. O'Neil* and *J. Joshua Wheeler.*

*Martin E. Karlinsky, Howard W. Goldstein, Steven M. Freeman, Frederick M. Lawrence,* and *Elliot M. Mincberg* filed a brief for the Anti-Defamation League et al. as *amici curiae.*

cross burning as prima facie evidence of intent to intimidate renders the statute unconstitutional in its current form.

I

Respondents Barry Black, Richard Elliott, and Jonathan O'Mara were convicted separately of violating Virginia's cross-burning statute, § 18.2–423. That statute provides:

> "It shall be unlawful for any person or persons, with the intent of intimidating any person or group of persons, to burn, or cause to be burned, a cross on the property of another, a highway or other public place. Any person who shall violate any provision of this section shall be guilty of a Class 6 felony.
>
> "Any such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons."

On August 22, 1998, Barry Black led a Ku Klux Klan rally in Carroll County, Virginia. Twenty-five to thirty people attended this gathering, which occurred on private property with the permission of the owner, who was in attendance. The property was located on an open field just off Brushy Fork Road (State Highway 690) in Cana, Virginia.

When the sheriff of Carroll County learned that a Klan rally was occurring in his county, he went to observe it from the side of the road. During the approximately one hour that the sheriff was present, about 40 to 50 cars passed the site, a "few" of which stopped to ask the sheriff what was happening on the property. App. 71. Eight to ten houses were located in the vicinity of the rally. Rebecca Sechrist, who was related to the owner of the property where the rally took place, "sat and watched to see wha[t] [was] going on" from the lawn of her in-laws' house. She looked on as the Klan prepared for the gathering and subsequently conducted the rally itself. *Id.*, at 103.

During the rally, Sechrist heard Klan members speak about "what they were" and "what they believed in." *Id.*,

at 106. The speakers "talked real bad about the blacks and the Mexicans." *Id.*, at 109. One speaker told the assembled gathering that "he would love to take a .30/.30 and just random[ly] shoot the blacks." *Ibid.* The speakers also talked about "President Clinton and Hillary Clinton," and about how their tax money "goes to . . . the black people." *Ibid.* Sechrist testified that this language made her "very . . . scared." *Id.*, at 110.

At the conclusion of the rally, the crowd circled around a 25- to 30-foot cross. The cross was between 300 and 350 yards away from the road. According to the sheriff, the cross "then all of a sudden . . . went up in a flame." *Id.*, at 71. As the cross burned, the Klan played Amazing Grace over the loudspeakers. Sechrist stated that the cross burning made her feel "awful" and "terrible." *Id.*, at 110.

When the sheriff observed the cross burning, he informed his deputy that they needed to "find out who's responsible and explain to them that they cannot do this in the State of Virginia." *Id.*, at 72. The sheriff then went down the driveway, entered the rally, and asked "who was responsible for burning the cross." *Id.*, at 74. Black responded, "I guess I am because I'm the head of the rally." *Ibid.* The sheriff then told Black, "[T]here's a law in the State of Virginia that you cannot burn a cross and I'll have to place you under arrest for this." *Ibid.*

Black was charged with burning a cross with the intent of intimidating a person or group of persons, in violation of § 18.2–423. At his trial, the jury was instructed that "intent to intimidate means the motivation to intentionally put a person or a group of persons in fear of bodily harm. Such fear must arise from the willful conduct of the accused rather than from some mere temperamental timidity of the victim." *Id.*, at 146. The trial court also instructed the jury that "the burning of a cross by itself is sufficient evidence from which you may infer the required intent." *Ibid.* When Black objected to this last instruction on First Amendment grounds,

the prosecutor responded that the instruction was "taken straight out of the [Virginia] Model Instructions." *Id.*, at 134. The jury found Black guilty, and fined him $2,500. The Court of Appeals of Virginia affirmed Black's conviction. Rec. No. 1581–99–3 (Va. App., Dec. 19, 2000), App. 201.

On May 2, 1998, respondents Richard Elliott and Jonathan O'Mara, as well as a third individual, attempted to burn a cross on the yard of James Jubilee. Jubilee, an African-American, was Elliott's next-door neighbor in Virginia Beach, Virginia. Four months prior to the incident, Jubilee and his family had moved from California to Virginia Beach. Before the cross burning, Jubilee spoke to Elliott's mother to inquire about shots being fired from behind the Elliott home. Elliott's mother explained to Jubilee that her son shot firearms as a hobby, and that he used the backyard as a firing range.

On the night of May 2, respondents drove a truck onto Jubilee's property, planted a cross, and set it on fire. Their apparent motive was to "get back" at Jubilee for complaining about the shooting in the backyard. *Id.*, at 241. Respondents were not affiliated with the Klan. The next morning, as Jubilee was pulling his car out of the driveway, he noticed the partially burned cross approximately 20 feet from his house. After seeing the cross, Jubilee was "very nervous" because he "didn't know what would be the next phase," and because "a cross burned in your yard . . . tells you that it's just the first round." *Id.*, at 231.

Elliott and O'Mara were charged with attempted cross burning and conspiracy to commit cross burning. O'Mara pleaded guilty to both counts, reserving the right to challenge the constitutionality of the cross-burning statute. The judge sentenced O'Mara to 90 days in jail and fined him $2,500. The judge also suspended 45 days of the sentence and $1,000 of the fine.

At Elliott's trial, the judge originally ruled that the jury would be instructed "that the burning of a cross by itself is

sufficient evidence from which you may infer the required intent." *Id.*, at 221–222. At trial, however, the court instructed the jury that the Commonwealth must prove that "the defendant intended to commit cross burning," that "the defendant did a direct act toward the commission of the cross burning," and that "the defendant had the intent of intimidating any person or group of persons." *Id.*, at 250. The court did not instruct the jury on the meaning of the word "intimidate," nor on the prima facie evidence provision of § 18.2–423. The jury found Elliott guilty of attempted cross burning and acquitted him of conspiracy to commit cross burning. It sentenced Elliott to 90 days in jail and a $2,500 fine. The Court of Appeals of Virginia affirmed the convictions of both Elliott and O'Mara. *O'Mara* v. *Commonwealth*, 33 Va. App. 525, 535 S. E. 2d 175 (2000).

Each respondent appealed to the Supreme Court of Virginia, arguing that § 18.2–423 is facially unconstitutional. The Supreme Court of Virginia consolidated all three cases, and held that the statute is unconstitutional on its face. 262 Va. 764, 553 S. E. 2d 738 (2001). It held that the Virginia cross-burning statute "is analytically indistinguishable from the ordinance found unconstitutional in *R. A. V.* [v. *St. Paul*, 505 U. S. 377 (1992)]." *Id.*, at 772, 553 S. E. 2d, at 742. The Virginia statute, the court held, discriminates on the basis of content since it "selectively chooses only cross burning because of its distinctive message." *Id.*, at 774, 553 S. E. 2d, at 744. The court also held that the prima facie evidence provision renders the statute overbroad because "[t]he enhanced probability of prosecution under the statute chills the expression of protected speech." *Id.*, at 777, 553 S. E. 2d, at 746.

Three justices dissented, concluding that the Virginia cross-burning statute passes constitutional muster because it proscribes only conduct that constitutes a true threat. The justices noted that unlike the ordinance found unconstitutional in *R. A. V.* v. *St. Paul*, 505 U. S. 377 (1992), the Virginia

statute does not just target cross burning "on the basis of race, color, creed, religion or gender." 262 Va., at 791, 553 S. E. 2d, at 753. Rather, "the Virginia statute applies to any individual who burns a cross for any reason provided the cross is burned with the intent to intimidate." *Ibid.* The dissenters also disagreed with the majority's analysis of the prima facie provision because the inference alone "is clearly insufficient to establish beyond a reasonable doubt that a defendant burned a cross with the intent to intimidate." *Id.,* at 795, 553 S. E. 2d, at 756. The dissent noted that the burden of proof still remains on the Commonwealth to prove intent to intimidate. We granted certiorari. 535 U. S. 1094 (2002).[1]

## II

Cross burning originated in the 14th century as a means for Scottish tribes to signal each other. See M. Newton & J. Newton, The Ku Klux Klan: An Encyclopedia 145 (1991). Sir Walter Scott used cross burnings for dramatic effect in The Lady of the Lake, where the burning cross signified both a summons and a call to arms. See W. Scott, The Lady of The Lake, canto third. Cross burning in this country, however, long ago became unmoored from its Scottish ancestry. Burning a cross in the United States is inextricably intertwined with the history of the Ku Klux Klan.

The first Ku Klux Klan began in Pulaski, Tennessee, in the spring of 1866. Although the Ku Klux Klan started as a social club, it soon changed into something far different. The Klan fought Reconstruction and the corresponding drive to allow freed blacks to participate in the political process.

---

[1] After we granted certiorari, the Commonwealth enacted another statute designed to remedy the constitutional problems identified by the state court. See Va. Code Ann. § 18.2–423.01 (2002). Section 18.2–423.01 bans the burning of "an object" when done "with the intent of intimidating any person or group of persons." The statute does not contain any prima facie evidence provision. Section 18.2–423.01, however, did not repeal § 18.2–423, the cross-burning statute at issue in this case.

Soon the Klan imposed "a veritable reign of terror" throughout the South. S. Kennedy, Southern Exposure 31 (1991) (hereinafter Kennedy). The Klan employed tactics such as whipping, threatening to burn people at the stake, and murder. W. Wade, The Fiery Cross: The Ku Klux Klan in America 48–49 (1987) (hereinafter Wade). The Klan's victims included blacks, southern whites who disagreed with the Klan, and "carpetbagger" northern whites.

The activities of the Ku Klux Klan prompted legislative action at the national level. In 1871, "President Grant sent a message to Congress indicating that the Klan's reign of terror in the Southern States had rendered life and property insecure." *Jett* v. *Dallas Independent School Dist.*, 491 U. S. 701, 722 (1989) (internal quotation marks and alterations omitted). In response, Congress passed what is now known as the Ku Klux Klan Act. See "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes," 17 Stat. 13 (now codified at 42 U. S. C. §§ 1983, 1985, and 1986). President Grant used these new powers to suppress the Klan in South Carolina, the effect of which severely curtailed the Klan in other States as well. By the end of Reconstruction in 1877, the first Klan no longer existed.

The genesis of the second Klan began in 1905, with the publication of Thomas Dixon's The Clansmen: An Historical Romance of the Ku Klux Klan. Dixon's book was a sympathetic portrait of the first Klan, depicting the Klan as a group of heroes "saving" the South from blacks and the "horrors" of Reconstruction. Although the first Klan never actually practiced cross burning, Dixon's book depicted the Klan burning crosses to celebrate the execution of former slaves. *Id.*, at 324–326; see also *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 770–771 (1995) (THOMAS, J., concurring). Cross burning thereby became associated with the first Ku Klux Klan. When D. W. Griffith turned Dixon's book into the movie The Birth of a Nation in 1915,

the association between cross burning and the Klan became indelible. In addition to the cross burnings in the movie, a poster advertising the film displayed a hooded Klansman riding a hooded horse, with his left hand holding the reins of the horse and his right hand holding a burning cross above his head. Wade 127. Soon thereafter, in November 1915, the second Klan began.

From the inception of the second Klan, cross burnings have been used to communicate both threats of violence and messages of shared ideology. The first initiation ceremony occurred on Stone Mountain near Atlanta, Georgia. While a 40-foot cross burned on the mountain, the Klan members took their oaths of loyalty. See Kennedy 163. This cross burning was the second recorded instance in the United States. The first known cross burning in the country had occurred a little over one month before the Klan initiation, when a Georgia mob celebrated the lynching of Leo Frank by burning a "gigantic cross" on Stone Mountain that was "visible throughout" Atlanta. Wade 144 (internal quotation marks omitted).

The new Klan's ideology did not differ much from that of the first Klan. As one Klan publication emphasized, "We avow the distinction between [the] races, . . . and we shall ever be true to the faithful maintenance of White Supremacy and will strenuously oppose any compromise thereof in any and all things." *Id.*, at 147–148 (internal quotation marks omitted). Violence was also an elemental part of this new Klan. By September 1921, the New York World newspaper documented 152 acts of Klan violence, including 4 murders, 41 floggings, and 27 tar-and-featherings. Wade 160.

Often, the Klan used cross burnings as a tool of intimidation and a threat of impending violence. For example, in 1939 and 1940, the Klan burned crosses in front of synagogues and churches. See Kennedy 175. After one cross burning at a synagogue, a Klan member noted that if the cross burning did not "shut the Jews up, we'll cut a few

throats and see what happens." *Ibid.* (internal quotation marks omitted). In Miami in 1941, the Klan burned four crosses in front of a proposed housing project, declaring, "We are here to keep niggers out of your town . . . . When the law fails you, call on us." *Id.*, at 176 (internal quotation marks omitted). And in Alabama in 1942, in "a whirlwind climax to weeks of flogging and terror," the Klan burned crosses in front of a union hall and in front of a union leader's home on the eve of a labor election. *Id.*, at 180. These cross burnings embodied threats to people whom the Klan deemed antithetical to its goals. And these threats had special force given the long history of Klan violence.

The Klan continued to use cross burnings to intimidate after World War II. In one incident, an African-American "school teacher who recently moved his family into a block formerly occupied only by whites asked the protection of city police . . . after the burning of a cross in his front yard." Richmond News Leader, Jan. 21, 1949, p. 19, App. 312. And after a cross burning in Suffolk, Virginia, during the late 1940's, the Virginia Governor stated that he would "not allow any of our people of any race to be subjected to terrorism or intimidation in any form by the Klan or any other organization." D. Chalmers, Hooded Americanism: The History of the Ku Klux Klan 333 (1980) (hereinafter Chalmers). These incidents of cross burning, among others, helped prompt Virginia to enact its first version of the cross-burning statute in 1950.

The decision of this Court in *Brown* v. *Board of Education,* 347 U. S. 483 (1954), along with the civil rights movement of the 1950's and 1960's, sparked another outbreak of Klan violence. These acts of violence included bombings, beatings, shootings, stabbings, and mutilations. See, *e. g.,* Chalmers 349–350; Wade 302–303. Members of the Klan burned crosses on the lawns of those associated with the civil rights movement, assaulted the Freedom Riders, bombed churches, and murdered blacks as well as whites

whom the Klan viewed as sympathetic toward the civil rights movement.

Throughout the history of the Klan, cross burnings have also remained potent symbols of shared group identity and ideology. The burning cross became a symbol of the Klan itself and a central feature of Klan gatherings. According to the Klan constitution (called the kloran), the "fiery cross" was the "emblem of that sincere, unselfish devotedness of all klansmen to the sacred purpose and principles we have espoused." The Ku Klux Klan Hearings before the House Committee on Rules, 67th Cong., 1st Sess., 114, Exh. G (1921); see also Wade 419. And the Klan has often published its newsletters and magazines under the name The Fiery Cross. See *id.*, at 226, 489.

At Klan gatherings across the country, cross burning became the climax of the rally or the initiation. Posters advertising an upcoming Klan rally often featured a Klan member holding a cross. See N. MacLean, Behind the Mask of Chivalry: The Making of the Second Ku Klux Klan 142–143 (1994). Typically, a cross burning would start with a prayer by the "Klavern" minister, followed by the singing of Onward Christian Soldiers. The Klan would then light the cross on fire, as the members raised their left arm toward the burning cross and sang The Old Rugged Cross. Wade 185. Throughout the Klan's history, the Klan continued to use the burning cross in their ritual ceremonies.

For its own members, the cross was a sign of celebration and ceremony. During a joint Nazi-Klan rally in 1940, the proceeding concluded with the wedding of two Klan members who "were married in full Klan regalia beneath a blazing cross." *Id.*, at 271. In response to antimasking bills introduced in state legislatures after World War II, the Klan burned crosses in protest. See Chalmers 340. On March 26, 1960, the Klan engaged in rallies and cross burnings throughout the South in an attempt to recruit 10 million members. See Wade 305. Later in 1960, the Klan became

an issue in the third debate between Richard Nixon and John Kennedy, with both candidates renouncing the Klan. After this debate, the Klan reiterated its support for Nixon by burning crosses. See *id.*, at 309. And cross burnings featured prominently in Klan rallies when the Klan attempted to move toward more nonviolent tactics to stop integration. See *id.*, at 323; cf. Chalmers 368–369, 371–372, 380, 384. In short, a burning cross has remained a symbol of Klan ideology and of Klan unity.

To this day, regardless of whether the message is a political one or whether the message is also meant to intimidate, the burning of a cross is a "symbol of hate." *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S., at 771 (THOMAS, J., concurring). And while cross burning sometimes carries no intimidating message, at other times the intimidating message is the *only* message conveyed. For example, when a cross burning is directed at a particular person not affiliated with the Klan, the burning cross often serves as a message of intimidation, designed to inspire in the victim a fear of bodily harm. Moreover, the history of violence associated with the Klan shows that the possibility of injury or death is not just hypothetical. The person who burns a cross directed at a particular person often is making a serious threat, meant to coerce the victim to comply with the Klan's wishes unless the victim is willing to risk the wrath of the Klan. Indeed, as the cases of respondents Elliott and O'Mara indicate, individuals without Klan affiliation who wish to threaten or menace another person sometimes use cross burning because of this association between a burning cross and violence.

In sum, while a burning cross does not inevitably convey a message of intimidation, often the cross burner intends that the recipients of the message fear for their lives. And when a cross burning is used to intimidate, few if any messages are more powerful.

## III

### A

The First Amendment, applicable to the States through the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech." The hallmark of the protection of free speech is to allow "free trade in ideas"—even ideas that the overwhelming majority of people might find distasteful or discomforting. *Abrams* v. *United States*, 250 U. S. 616, 630 (1919) (Holmes, J., dissenting); see also *Texas* v. *Johnson*, 491 U. S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"). Thus, the First Amendment "ordinarily" denies a State "the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence." *Whitney* v. *California*, 274 U. S. 357, 374 (1927) (Brandeis, J., concurring). The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. See, *e. g.*, *R. A. V.* v. *City of St. Paul*, 505 U. S., at 382; *Texas* v. *Johnson*, *supra*, at 405–406; *United States* v. *O'Brien*, 391 U. S. 367, 376–377 (1968); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 505 (1969).

The protections afforded by the First Amendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution. See, *e. g.*, *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem"). The First Amendment permits "restrictions upon the content of speech in a few limited areas, which are 'of such slight social value

as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *R. A. V.* v. *City of St. Paul, supra,* at 382–383 (quoting *Chaplinsky* v. *New Hampshire, supra,* at 572).

Thus, for example, a State may punish those words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky* v. *New Hampshire, supra,* at 572; see also *R. A. V.* v. *City of St. Paul, supra,* at 383 (listing limited areas where the First Amendment permits restrictions on the content of speech). We have consequently held that fighting words—"those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction"—are generally proscribable under the First Amendment. *Cohen* v. *California,* 403 U. S. 15, 20 (1971); see also *Chaplinsky* v. *New Hampshire, supra,* at 572. Furthermore, "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg* v. *Ohio,* 395 U. S. 444, 447 (1969) *(per curiam).* And the First Amendment also permits a State to ban a "true threat." *Watts* v. *United States,* 394 U. S. 705, 708 (1969) *(per curiam)* (internal quotation marks omitted); accord, *R. A. V.* v. *City of St. Paul, supra,* at 388 ("[T]hreats of violence are outside the First Amendment"); *Madsen* v. *Women's Health Center, Inc.,* 512 U. S. 753, 774 (1994); *Schenck* v. *Pro-Choice Network of Western N. Y.,* 519 U. S. 357, 373 (1997).

"True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. See *Watts* v. *United States, supra,* at 708 ("political hyberbole" is not a true threat); *R. A. V.* v. *City of St. Paul,* 505 U. S., at 388. The

speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." *Ibid.* Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death. Respondents do not contest that some cross burnings fit within this meaning of intimidating speech, and rightly so. As noted in Part II, *supra,* the history of cross burning in this country shows that cross burning is often intimidating, intended to create a pervasive fear in victims that they are a target of violence.

B

The Supreme Court of Virginia ruled that in light of *R. A. V.* v. *City of St. Paul, supra,* even if it is constitutional to ban cross burning in a content-neutral manner, the Virginia cross-burning statute is unconstitutional because it discriminates on the basis of content and viewpoint. 262 Va., at 771–776, 553 S. E. 2d, at 742–745. It is true, as the Supreme Court of Virginia held, that the burning of a cross is symbolic expression. The reason why the Klan burns a cross at its rallies, or individuals place a burning cross on someone else's lawn, is that the burning cross represents the message that the speaker wishes to communicate. Individuals burn crosses as opposed to other means of communication because cross burning carries a message in an effective and dramatic manner.[2]

---

[2] JUSTICE THOMAS argues in dissent that cross burning is "conduct, not expression." *Post,* at 394. While it is of course true that burning a cross is conduct, it is equally true that the First Amendment protects symbolic conduct as well as pure speech. See *supra,* at 358. As JUSTICE THOMAS has previously recognized, a burning cross is a "symbol of hate," and a

The fact that cross burning is symbolic expression, however, does not resolve the constitutional question. The Supreme Court of Virginia relied upon *R. A. V.* v. *City of St. Paul, supra,* to conclude that once a statute discriminates on the basis of this type of content, the law is unconstitutional. We disagree.

In *R. A. V.,* we held that a local ordinance that banned certain symbolic conduct, including cross burning, when done with the knowledge that such conduct would "'arouse anger, alarm or resentment in others on the basis of race, color, creed, religion or gender'" was unconstitutional. *Id.,* at 380 (quoting the St. Paul Bias-Motivated Crime Ordinance, St. Paul, Minn., Legis. Code § 292.02 (1990)). We held that the ordinance did not pass constitutional muster because it discriminated on the basis of content by targeting only those individuals who "provoke violence" on a basis specified in the law. 505 U. S., at 391. The ordinance did not cover "[t]hose who wish to use 'fighting words' in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality." *Ibid.* This content-based discrimination was unconstitutional because it allowed the city "to impose special prohibitions on those speakers who express views on disfavored subjects." *Ibid.*

We did not hold in *R. A. V.* that the First Amendment prohibits *all* forms of content-based discrimination within a proscribable area of speech. Rather, we specifically stated that some types of content discrimination did not violate the First Amendment:

> "When the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or

---

"a symbol of white supremacy." *Capitol Square Review and Advisory Bd.* v. *Pinette,* 515 U. S. 753, 770–771 (1995) (concurring opinion).

viewpoint discrimination exists. Such a reason, having been adjudged neutral enough to support exclusion of the entire class of speech from First Amendment protection, is also neutral enough to form the basis of distinction within the class." *Id.*, at 388.

Indeed, we noted that it would be constitutional to ban only a particular type of threat: "[T]he Federal Government can criminalize only those threats of violence that are directed against the President . . . since the reasons why threats of violence are outside the First Amendment . . . have special force when applied to the person of the President." *Ibid.* And a State may "choose to prohibit only that obscenity which is the most patently offensive *in its prurience*—*i. e.*, that which involves the most lascivious displays of sexual activity." *Ibid.* (emphasis in original). Consequently, while the holding of *R. A. V.* does not permit a State to ban only obscenity based on "offensive *political* messages," *ibid.*, or "only those threats against the President that mention his policy on aid to inner cities," *ibid.*, the First Amendment permits content discrimination "based on the very reasons why the particular class of speech at issue . . . is proscribable," *id.*, at 393.

Similarly, Virginia's statute does not run afoul of the First Amendment insofar as it bans cross burning with intent to intimidate. Unlike the statute at issue in *R. A. V.*, the Virginia statute does not single out for opprobrium only that speech directed toward "one of the specified disfavored topics." *Id.*, at 391. It does not matter whether an individual burns a cross with intent to intimidate because of the victim's race, gender, or religion, or because of the victim's "political affiliation, union membership, or homosexuality." *Ibid.* Moreover, as a factual matter it is not true that cross burners direct their intimidating conduct solely to racial or religious minorities. See, *e. g.*, *supra*, at 355 (noting the instances of cross burnings directed at union members); *State v. Miller*, 6 Kan. App. 2d 432, 629 P. 2d 748 (1981) (describing

the case of a defendant who burned a cross in the yard of the lawyer who had previously represented him and who was currently prosecuting him). Indeed, in the case of Elliott and O'Mara, it is at least unclear whether the respondents burned a cross due to racial animus. See 262 Va., at 791, 553 S. E. 2d, at 753 (Hassell, J., dissenting) (noting that "these defendants burned a cross because they were angry that their neighbor had complained about the presence of a firearm shooting range in the Elliott's yard, not because of any racial animus").

The First Amendment permits Virginia to outlaw cross burnings done with the intent to intimidate because burning a cross is a particularly virulent form of intimidation. Instead of prohibiting all intimidating messages, Virginia may choose to regulate this subset of intimidating messages in light of cross burning's long and pernicious history as a signal of impending violence. Thus, just as a State may regulate only that obscenity which is the most obscene due to its prurient content, so too may a State choose to prohibit only those forms of intimidation that are most likely to inspire fear of bodily harm. A ban on cross burning carried out with the intent to intimidate is fully consistent with our holding in *R. A. V.* and is proscribable under the First Amendment.

## IV

The Supreme Court of Virginia ruled in the alternative that Virginia's cross-burning statute was unconstitutionally overbroad due to its provision stating that "[a]ny such burning of a cross shall be prima facie evidence of an intent to intimidate a person or group of persons." Va. Code Ann. § 18.2–423 (1996). The Commonwealth added the prima facie provision to the statute in 1968. The court below did not reach whether this provision is severable from the rest of the cross-burning statute under Virginia law. See § 1–17.1 ("The provisions of all statutes are severable unless . . . it is

apparent that two or more statutes or provisions must operate in accord with one another"). In this Court, as in the Supreme Court of Virginia, respondents do not argue that the prima facie evidence provision is unconstitutional as applied to any one of them. Rather, they contend that the provision is unconstitutional on its face.

The Supreme Court of Virginia has not ruled on the meaning of the prima facie evidence provision. It has, however, stated that "the act of burning a cross alone, with no evidence of intent to intimidate, will nonetheless suffice for arrest and prosecution and will insulate the Commonwealth from a motion to strike the evidence at the end of its case-in-chief." 262 Va., at 778, 553 S. E. 2d, at 746. The jury in the case of Richard Elliott did not receive any instruction on the prima facie evidence provision, and the provision was not an issue in the case of Jonathan O'Mara because he pleaded guilty. The court in Barry Black's case, however, instructed the jury that the provision means: "The burning of a cross, by itself, is sufficient evidence from which you may infer the required intent." App. 196. This jury instruction is the same as the Model Jury Instruction in the Commonwealth of Virginia. See Virginia Model Jury Instructions, Criminal, Instruction No. 10.250 (1998 and Supp. 2001).

The prima facie evidence provision, as interpreted by the jury instruction, renders the statute unconstitutional. Because this jury instruction is the Model Jury Instruction, and because the Supreme Court of Virginia had the opportunity to expressly disavow the jury instruction, the jury instruction's construction of the prima facie provision "is a ruling on a question of state law that is as binding on us as though the precise words had been written into" the statute. *E. g.,* *Terminiello* v. *Chicago,* 337 U. S. 1, 4 (1949) (striking down an ambiguous statute on facial grounds based upon the instruction given to the jury); see also *New York* v. *Ferber,* 458 U. S. 747, 768, n. 21 (1982) (noting that *Terminiello* involved a facial challenge to the statute); *Secretary of State*

*of Md.* v. *Joseph H. Munson Co.,* 467 U. S. 947, 965, n. 13 (1984); Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844, 845–846, n. 8 (1970); Monaghan, Overbreadth, 1981 S. Ct. Rev. 1, 10–12; Blakey & Murray, Threats, Free Speech, and the Jurisprudence of the Federal Criminal Law, 2002 B. Y. U. L. Rev. 829, 883, n. 133. As construed by the jury instruction, the prima facie provision strips away the very reason why a State may ban cross burning with the intent to intimidate. The prima facie evidence provision permits a jury to convict in every cross-burning case in which defendants exercise their constitutional right not to put on a defense. And even where a defendant like Black presents a defense, the prima facie evidence provision makes it more likely that the jury will find an intent to intimidate regardless of the particular facts of the case. The provision permits the Commonwealth to arrest, prosecute, and convict a person based solely on the fact of cross burning itself.

It is apparent that the provision as so interpreted " 'would create an unacceptable risk of the suppression of ideas.' " *Secretary of State of Md.* v. *Joseph H. Munson Co., supra,* at 965, n. 13 (quoting *Members of City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789, 797 (1984)). The act of burning a cross may mean that a person is engaging in constitutionally proscribable intimidation. But that same act may mean only that the person is engaged in core political speech. The prima facie evidence provision in this statute blurs the line between these two meanings of a burning cross. As interpreted by the jury instruction, the provision chills constitutionally protected political speech because of the possibility that the Commonwealth will prosecute—and potentially convict—somebody engaging only in lawful political speech at the core of what the First Amendment is designed to protect.

As the history of cross burning indicates, a burning cross is not always intended to intimidate. Rather, sometimes the cross burning is a statement of ideology, a symbol of group

solidarity. It is a ritual used at Klan gatherings, and it is used to represent the Klan itself. Thus, "[b]urning a cross at a political rally would almost certainly be protected expression." *R. A. V. v. St. Paul,* 505 U. S., at 402, n. 4 (White, J., concurring in judgment) (citing *Brandenburg v. Ohio,* 395 U. S., at 445). Cf. *National Socialist Party of America v. Skokie,* 432 U. S. 43 (1977) *(per curiam).* Indeed, occasionally a person who burns a cross does not intend to express either a statement of ideology or intimidation. Cross burnings have appeared in movies such as Mississippi Burning, and in plays such as the stage adaptation of Sir Walter Scott's The Lady of the Lake.

The prima facie provision makes no effort to distinguish among these different types of cross burnings. It does not distinguish between a cross burning done with the purpose of creating anger or resentment and a cross burning done with the purpose of threatening or intimidating a victim. It does not distinguish between a cross burning at a public rally or a cross burning on a neighbor's lawn. It does not treat the cross burning directed at an individual differently from the cross burning directed at a group of like-minded believers. It allows a jury to treat a cross burning on the property of another with the owner's acquiescence in the same manner as a cross burning on the property of another without the owner's permission. To this extent I agree with JUSTICE SOUTER that the prima facie evidence provision can "skew jury deliberations toward conviction in cases where the evidence of intent to intimidate is relatively weak and arguably consistent with a solely ideological reason for burning." *Post,* at 385 (opinion concurring in judgment in part and dissenting in part).

It may be true that a cross burning, even at a political rally, arouses a sense of anger or hatred among the vast majority of citizens who see a burning cross. But this sense of anger or hatred is not sufficient to ban all cross burnings. As Gerald Gunther has stated, "The lesson I have drawn

from my childhood in Nazi Germany and my happier adult life in this country is the need to walk the sometimes difficult path of denouncing the bigot's hateful ideas with all my power, yet at the same time challenging any community's attempt to suppress hateful ideas by force of law." Casper, Gerry, 55 Stan. L. Rev. 647, 649 (2002) (internal quotation marks omitted). The prima facie evidence provision in this case ignores all of the contextual factors that are necessary to decide whether a particular cross burning is intended to intimidate. The First Amendment does not permit such a shortcut.

For these reasons, the prima facie evidence provision, as interpreted through the jury instruction and as applied in Barry Black's case, is unconstitutional on its face. We recognize that the Supreme Court of Virginia has not authoritatively interpreted the meaning of the prima facie evidence provision. Unlike JUSTICE SCALIA, we refuse to speculate on whether *any* interpretation of the prima facie evidence provision would satisfy the First Amendment. Rather, all we hold is that because of the interpretation of the prima facie evidence provision given by the jury instruction, the provision makes the statute facially invalid at this point. We also recognize the theoretical possibility that the court, on remand, could interpret the provision in a manner different from that so far set forth in order to avoid the constitutional objections we have described. We leave open that possibility. We also leave open the possibility that the provision is severable, and if so, whether Elliott and O'Mara could be retried under § 18.2-423.

## V

With respect to Barry Black, we agree with the Supreme Court of Virginia that his conviction cannot stand, and we affirm the judgment of the Supreme Court of Virginia. With respect to Elliott and O'Mara, we vacate the judgment

of the Supreme Court of Virginia, and remand the case for further proceedings.

*It is so ordered.*

JUSTICE STEVENS, concurring.

Cross burning with "an intent to intimidate," Va. Code Ann. § 18.2–423 (1996), unquestionably qualifies as the kind of threat that is unprotected by the First Amendment. For the reasons stated in the separate opinions that Justice White and I wrote in *R. A. V.* v. *St. Paul,* 505 U. S. 377 (1992), that simple proposition provides a sufficient basis for upholding the basic prohibition in the Virginia statute even though it does not cover other types of threatening expressive conduct. With this observation, I join JUSTICE O'CONNOR's opinion.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins as to Parts I and II, concurring in part, concurring in the judgment in part, and dissenting in part.

I agree with the Court that, under our decision in *R. A. V.* v. *St. Paul,* 505 U. S. 377 (1992), a State may, without infringing the First Amendment, prohibit cross burning carried out with the intent to intimidate. Accordingly, I join Parts I–III of the Court's opinion. I also agree that we should vacate and remand the judgment of the Virginia Supreme Court so that that court can have an opportunity authoritatively to construe the prima-facie-evidence provision of Va. Code Ann. § 18.2–423 (1996). I write separately, however, to describe what I believe to be the correct interpretation of § 18.2–423, and to explain why I believe there is no justification for the plurality's apparent decision to invalidate that provision on its face.

I

Section 18.2–423 provides that the burning of a cross in public view "shall be prima facie evidence of an intent to intimidate." In order to determine whether this component

of the statute violates the Constitution, it is necessary, first, to establish precisely what the presentation of prima facie evidence accomplishes.

Typically, "prima facie evidence" is defined as:

> "Such evidence as, in the judgment of the law, is sufficient to establish a given fact . . . and which if not rebutted or contradicted, will remain sufficient. [Such evidence], if unexplained or uncontradicted, is sufficient to sustain a judgment in favor of the issue which it supports, but [it] may be contradicted by other evidence." Black's Law Dictionary 1190 (6th ed. 1990).

The Virginia Supreme Court has, in prior cases, embraced this canonical understanding of the pivotal statutory language. *E. g., Babbitt* v. *Miller,* 192 Va. 372, 379–380, 64 S. E. 2d 718, 722 (1951) (*"Prima facie* evidence is evidence which on its first appearance is sufficient to raise a presumption of fact or establish the fact in question unless rebutted"). For example, in *Nance* v. *Commonwealth,* 203 Va. 428, 124 S. E. 2d 900 (1962), the Virginia Supreme Court interpreted a law of the Commonwealth that (1) prohibited the possession of certain "burglarious" tools "with intent to commit burglary, robbery, or larceny . . . ," and (2) provided that "[t]he possession of such burglarious tools . . . shall be prima facie evidence of an intent to commit burglary, robbery or larceny." Va. Code Ann. § 18.1–87 (1960). The court explained that the prima-facie-evidence provision "cuts off no defense nor interposes any obstacle to a contest of the facts, and 'relieves neither the court nor the jury of the duty to determine all of the questions of fact from the weight of the whole evidence.'" *Nance* v. *Commonwealth,* 203 Va., at 432, 124 S. E. 2d, at 903–904; see also *ibid.,* 124 S. E. 2d, at 904 (noting that the prima-facie-evidence provision " 'is merely a rule of evidence and not the determination of a fact . . .' ").

The established meaning in Virginia, then, of the term "prima facie evidence" appears to be perfectly orthodox: It

is evidence that suffices, on its own, to establish a particular fact. But it is hornbook law that this is true only to the extent that the evidence goes unrebutted. "Prima facie evidence of a fact is such evidence as, in judgment of law, is sufficient to establish the fact; and, *if not rebutted*, remains sufficient for the purpose." 7B Michie's Jurisprudence of Virginia and West Virginia § 32 (1998) (emphasis added).

To be sure, Virginia is entirely free, if it wishes, to discard the canonical understanding of the term "prima facie evidence." Its courts are also permitted to interpret the phrase in different ways for purposes of different statutes. In this case, however, the Virginia Supreme Court has done nothing of the sort. To the extent that tribunal has spoken to the question of what "prima facie evidence" means for purposes of § 18.2–423, it has not deviated a whit from its prior practice and from the ordinary legal meaning of these words. Rather, its opinion explained that under § 18.2–423, "the act of burning a cross alone, with no evidence of intent to intimidate, will . . . suffice for arrest and prosecution and will insulate the Commonwealth from a motion to strike the evidence at the end of its case-in-chief." 262 Va. 764, 778, 553 S. E. 2d 738, 746 (2001). Put otherwise, where the Commonwealth has demonstrated through its case in chief that the defendant burned a cross in public view, this is sufficient, at least until the defendant has come forward with rebuttal evidence, to create a jury issue with respect to the intent element of the offense.

It is important to note that the Virginia Supreme Court did not suggest (as did the trial court's jury instructions in respondent Black's case, see *infra*, at 377) that a jury may, in light of the prima-facie-evidence provision, ignore any rebuttal evidence that has been presented and, solely on the basis of a showing that the defendant burned a cross, find that he intended to intimidate. Nor, crucially, did that court say that the presentation of prima facie evidence is always sufficient to get a case to a jury, *i. e.*, that a court may never

direct a verdict for a defendant who has been shown to have burned a cross in public view, even if, by the end of trial, the defendant has presented rebuttal evidence. Instead, according to the Virginia Supreme Court, the effect of the prima-facie-evidence provision is far more limited. It suffices to "insulate the Commonwealth from a motion to strike the evidence *at the end of its case-in-chief*," but it does nothing more. 262 Va., at 778, 553 S. E. 2d, at 746 (emphasis added). That is, presentation of evidence that a defendant burned a cross in public view is automatically sufficient, on its own, to support an inference that the defendant intended to intimidate *only until* the defendant comes forward with some evidence in rebuttal.

## II

The question presented, then, is whether, given this understanding of the term "prima facie evidence," the cross-burning statute is constitutional. The Virginia Supreme Court answered that question in the negative. It stated that "§ 18.2–423 sweeps within its ambit for arrest and prosecution, both protected and unprotected speech." *Ibid.* "The enhanced probability of prosecution under the statute chills the expression of protected speech sufficiently to render the statute overbroad." *Id.*, at 777, 553 S. E. 2d, at 746.

This approach toward overbreadth analysis is unprecedented. We have never held that the mere threat that individuals who engage in protected conduct will be subject to arrest and prosecution suffices to render a statute overbroad. Rather, our overbreadth jurisprudence has consistently focused on whether *the prohibitory terms* of a particular statute extend to protected conduct; that is, we have inquired whether individuals who engage in protected conduct can be *convicted* under a statute, not whether they might be subject to arrest and prosecution. *E. g., Houston v. Hill*, 482 U. S. 451, 459 (1987) (a statute "that *make[s] unlawful* a substantial amount of constitutionally protected conduct may be held facially invalid" (emphasis added)); *Grayned v. City of Rock-*

*ford*, 408 U. S. 104, 114 (1972) (a statute may be overbroad "if in its reach it *prohibits* constitutionally protected conduct" (emphasis added)); *R. A. V. v. St. Paul*, 505 U. S., at 397 (White, J., concurring in judgment) (deeming the ordinance at issue "fatally overbroad because it *criminalizes . . .* expression protected by the First Amendment" (emphasis added)).

Unwilling to embrace the Virginia Supreme Court's novel mode of overbreadth analysis, today's opinion properly focuses on the question of who may be convicted, rather than who may be arrested and prosecuted, under § 18.2–423. Thus, it notes that "[t]he prima facie evidence provision permits a jury *to convict* in every cross-burning case in which defendants exercise their constitutional right not to put on a defense."[1]  *Ante*, at 365 (emphasis added).  In such cases, the plurality explains, "[t]he provision permits the Commonwealth to arrest, prosecute, *and convict* a person based solely on the fact of cross burning itself." *Ibid.* (emphasis added).  And this, according to the plurality, is constitutionally problematic because "a burning cross is not always intended to intimidate," and nonintimidating cross burning cannot be prohibited. *Ibid.*  In particular, the opinion notes that cross burning may serve as "a statement of ideology" or "a symbol of group solidarity" at Ku Klux Klan rituals, and may even serve artistic purposes as in the case of the film Mississippi Burning. *Ante*, at 365–366.

The plurality is correct in all of this—and it means that some individuals who engage in protected speech may, be-

---

[1] The plurality also asserts that "even where a defendant like Black presents a defense, the prima facie evidence provision makes it more likely that the jury will find an intent to intimidate regardless of the particular facts of the case." *Ante*, at 365.  There is no basis for this assertion. The Virginia Supreme Court's opinion in *Nance* v. *Commonwealth*, 203 Va. 428, 432, 124 S. E. 2d 900, 903–904 (1962), states, in no uncertain terms, that the presentation of a prima facie case " 'relieves neither the court nor the jury of the duty to determine all of the questions of fact from the weight of *the whole evidence.*' "  (Emphasis added.)

cause of the prima-facie-evidence provision, be subject to conviction. Such convictions, assuming they are unconstitutional, could be challenged on a case-by-case basis. The plurality, however, with little in the way of explanation, leaps to the conclusion that the *possibility* of such convictions justifies facial invalidation of the statute.

In deeming § 18.2–423 facially invalid, the plurality presumably means to rely on some species of overbreadth doctrine.[2] But it must be a rare species indeed. We have noted that "[i]n a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 494 (1982). If one looks only to the core provision of § 18.2–423—"[i]t shall be unlawful for any person or persons, with the intent of intimidating any person or group of persons, to burn, or cause to be burned, a cross . . ."—it appears *not* to capture any protected conduct; that language is limited in its reach to con-

---

[2] Overbreadth was, of course, the framework of analysis employed by the Virginia Supreme Court. See 262 Va. 764, 777–778, 553 S. E. 2d 738, 745–746 (2001) (examining the prima-facie-evidence provision in a section labeled "OVERBREADTH ANALYSIS" and holding that the provision "is overbroad"). Likewise, in their submissions to this Court, the parties' analyses of the prima-facie-evidence provision focus on the question of overbreadth. Brief for Petitioner 41–50 (confining its discussion of the prima-facie-evidence provision to a section titled "THE VIRGINIA STATUTE IS NOT OVERBROAD"); Brief for Respondents 39–41 (arguing that "[t]he prima facie evidence provision . . . render[s] [the statute] overbroad"); Reply Brief for Petitioner 13–20 (dividing its discussion of the prima-facie-evidence provision into sections titled "There Is No Real Overbreadth" and "There Is No Substantial Overbreadth"). This reliance on overbreadth doctrine is understandable. This Court has made clear that to succeed in a facial challenge *without* relying on overbreadth doctrine, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987). As the Court's opinion concedes, some of the speech covered by § 18.2–423 can constitutionally be proscribed, *ante*, at 363.

duct which a State is, under the Court's holding, *ante,* at 363, allowed to prohibit. In order to identify *any* protected conduct that is affected by Virginia's cross-burning law, the plurality is compelled to focus not on the statute's core prohibition, but on the prima-facie-evidence provision, and hence on *the process* through which the prohibited conduct may be found by a jury.[3] And even in that context, the plurality cannot claim that improper convictions will result from the operation of the prima-facie-evidence provision *alone.* As the plurality concedes, the only persons who might impermissibly be convicted by reason of that provision are those who adopt a particular trial strategy, to wit, abstaining from the presentation of a defense.

The plurality is thus left with a strikingly attenuated argument to support the claim that Virginia's cross-burning statute is facially invalid. The class of persons that the plurality contemplates could impermissibly be convicted under § 18.2–423 includes only those individuals who (1) burn a cross in public view, (2) do not intend to intimidate, (3) are nonetheless charged and prosecuted, and (4) refuse to present a defense. *Ante,* at 365 ("The prima facie evidence provision permits a jury to convict in every cross-burning case in which defendants exercise their constitutional right not to put on a defense").

Conceding (quite generously, in my view) that this class of persons exists, it cannot possibly give rise to a viable facial challenge, not even with the aid of our First Amendment

---

[3] Unquestionably, the process through which elements of a criminal offense are established in a jury trial may raise serious constitutional concerns. Typically, however, such concerns sound in due process, not First Amendment overbreadth. *E. g., County Court of Ulster Cty.* v. *Allen,* 442 U. S. 140, 156–157 (1979); *Barnes* v. *United States,* 412 U. S. 837, 838 (1973); *In re Winship,* 397 U. S. 358, 359 (1970). Respondents in this case have not challenged § 18.2–423 under the Due Process Clause, and neither the plurality nor the Virginia Supreme Court relies on due process in declaring the statute invalid.

overbreadth doctrine. For this Court has emphasized repeatedly that "where a statute regulates expressive conduct, the scope of the statute does not render it unconstitutional unless its overbreadth is not only real, but *substantial* as well, judged in relation to the statute's plainly legitimate sweep." *Osborne* v. *Ohio,* 495 U. S. 103, 112 (1990) (internal quotation marks omitted; emphasis added). See also *Houston* v. *Hill,* 482 U. S., at 458 ("Only a statute that is substantially overbroad may be invalidated on its face"); *Members of City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789, 800 (1984) ("[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge"); *New York* v. *Ferber,* 458 U. S. 747, 771 (1982) ("[A] law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications . . ."). The notion that the set of cases identified by the plurality in which convictions might improperly be obtained is sufficiently large to render the statute *substantially* overbroad is fanciful. The potential improper convictions of which the plurality complains are more appropriately classified as the sort of "marginal applications" of a statute in light of which "facial invalidation is inappropriate." *Parker* v. *Levy,* 417 U. S. 733, 760 (1974).[4]

---

[4] Confronted with the incontrovertible fact that this statute easily passes overbreadth analysis, the plurality is driven to the truly startling assertion that a statute which is not invalid in all of its applications may nevertheless be facially invalidated *even if it is not overbroad.* The *only expression* of that proposition that the plurality can find in our jurisprudence appears in footnote dictum in the 5-to-4 opinion in *Secretary of State of Md.* v. *Joseph H. Munson Co.,* 467 U. S. 947, 965–966, n. 13 (1984). See *id.,* at 975 (REHNQUIST, J., joined by Burger, C. J., and Powell and O'CONNOR, JJ., dissenting). *Stare decisis* cannot explain the newfound affection for this errant doctrine (even if *stare decisis* applied to dictum), because the holding of a *later* opinion (joined by six Justices) flatly repudiated it. See *United States* v. *Salerno, supra,* at 745 (REHNQUIST, C. J., joined by

Perhaps more alarming, the plurality concedes, *ante*, at 364, 365, that its understanding of the prima-facie-evidence provision is premised on the jury instructions given in respondent Black's case. This would all be well and good were it not for the fact that the plurality *facially invalidates* § 18.2–423. *Ante*, at 367 ("[T]he prima facie evidence provision, as interpreted through the jury instruction and as applied in Barry Black's case, is unconstitutional on its face"). I am aware of no case—and the plurality cites none—in which we have facially invalidated an *ambiguous* statute on the basis of a constitutionally troubling jury instruction.[5] And it is alto-

---

White, Blackmun, Powell, O'CONNOR, and SCALIA, JJ.) (to succeed in a facial challenge without relying on overbreadth doctrine, "the challenger must establish that no set of circumstances exists under which the Act would be valid").

Even if I were willing, as the plurality apparently is, to ignore our repudiation of the *Munson* dictum, that case provides no foundation whatever for facially invalidating a statute under the conditions presented here. Our willingness facially to invalidate the statute in *Munson* without reliance on First Amendment overbreadth was premised on our conclusion that the challenged provision was invalid *in all of its applications*. We explained that "there is no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits." *Munson*, 467 U. S., at 965–966. And we stated that "[t]he flaw in the statute is not simply that it includes within its sweep some impermissible applications, but that in all its applications it operates on a fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud." *Id.*, at 966. Unless the Court is prepared to abandon a contention that it takes great pains to establish—that "the history of cross burning in this country shows that cross burning is often intimidating, intended to create a pervasive fear in victims that they are a target of violence," *ante*, at 360—it is difficult to see how *Munson* has any bearing on the constitutionality of the prima-facie-evidence provision.

[5] The plurality's reliance on *Terminiello* v. *Chicago*, 337 U. S. 1 (1949), is mistaken. In that case the Court deemed only the jury instruction, rather than the ordinance under review, to be constitutionally infirm. To be sure, it held that such a jury instruction could *never* support a constitutionally valid conviction, but that is quite different from holding the *ordinance* to be facially invalid. Insofar as the ordinance was concerned, *Terminiello* made repeated references to the as-applied nature of the

gether unsurprising that there is no precedent for such a holding. For where state law is ambiguous, treating jury instructions as binding interpretations would cede an enormous measure of power over state law to trial judges. A single judge's idiosyncratic reading of a state statute could trigger its invalidation. In this case, the troubling instruction—"The burning of a cross, by itself, is sufficient evidence from which you may infer the required intent," App. 196—was taken verbatim from Virginia's Model Jury Instructions. But these Model Instructions have been neither promulgated by the legislature nor formally adopted by the Virginia Supreme Court. And it is hornbook law, in Virginia as elsewhere, that "[p]roffered instructions which do not correctly state the law . . . are erroneous and should be refused." 10A Michie's Jurisprudence of Virginia and West Virginia, Instructions § 15, p. 35 (Supp. 2000).

The plurality's willingness to treat this jury instruction as binding (and to strike down § 18.2–423 on that basis) would be shocking enough had the Virginia Supreme Court offered no guidance as to the proper construction of the prima-facie-evidence provision. For ordinarily we would decline to pass upon the constitutionality of an ambiguous state statute until that State's highest court had provided a binding construc-

---

challenge. *Id.*, at 3 (noting that the defendant "maintained at all times that the ordinance *as applied to his conduct* violated his right of free speech . . ." (emphasis added)); *id.*, at 5 (noting that *"[a]s construed and applied* [the provision] at least contains parts that are unconstitutional" (emphasis added)); *id.*, at 6 ("The pinch of the statute is in *its application"* (emphasis added)); *ibid.* ("The record makes clear that petitioner at all times challenged the constitutionality of the ordinance *as construed and applied to him"* (emphasis added)). See also Isserles, Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement, 48 Am. U. L. Rev. 359, 433, n. 333 (1998) (characterizing *Terminiello* as "adopting a court's jury instruction as an authoritative narrowing construction of a breach of the peace ordinance but ultimately confining its decision to overturning the defendant's conviction rather than invalidating the statute on its face").

tion.  *E. g., Arizonans for Official English* v. *Arizona,* 520 U. S. 43, 78 (1997).  If there is any exception to that rule, it is the case where one of two possible interpretations of the state statute would clearly render it unconstitutional, and the other would not.  In that situation, applying the maxim *"ut res magis valeat quam pereat"* we would do *precisely the opposite* of what the plurality does here—that is, we would adopt the alternative reading that renders the statute constitutional rather than unconstitutional.  The plurality's analysis is all the more remarkable given the dissonance between the interpretation of § 18.2–423 implicit in the jury instruction and the one suggested by the Virginia Supreme Court.  That court's opinion did not state that, once proof of public cross burning is presented, a jury is permitted to infer an intent to intimidate *solely* on this basis and regardless of whether a defendant has offered evidence to rebut any such inference.  To the contrary, in keeping with the black-letter understanding of "prima facie evidence," the Virginia Supreme Court explained that such evidence suffices only to "insulate the Commonwealth from a motion to strike the evidence at the end of its case-in-chief."  262 Va., at 778, 553 S. E. 2d, at 746.  The court did not so much as hint that a jury is permitted, under § 18.2–423, to ignore rebuttal evidence and infer an intent to intimidate strictly on the basis of the prosecution's prima facie case.  And unless and until the Supreme Court of Virginia tells us that the prima-facie-evidence provision permits a jury to infer intent under such conditions, this Court is entirely unjustified in facially invalidating § 18.2–423 on this basis.

As its concluding performance, in an apparent effort to paper over its unprecedented decision facially to invalidate a statute in light of an errant jury instruction, the plurality states:

> "We recognize that the Supreme Court of Virginia has not authoritatively interpreted the meaning of the prima facie evidence provision. . . . We also recognize the

theoretical possibility that the court, on remand, could interpret the provision in a manner different from that so far set forth in order to avoid the constitutional objections we have described. We leave open that possibility." *Ante*, at 367.

Now this is truly baffling. Having declared, in the immediately preceding sentence, that § 18.2–423 is "unconstitutional *on its face*," *ibid.* (emphasis added), the plurality holds out the possibility that the Virginia Supreme Court will offer some saving construction of the statute. It should go without saying that if a saving construction of § 18.2–423 is possible, then facial invalidation is inappropriate. *E. g., Harrison* v. *NAACP*, 360 U. S. 167, 176 (1959) ("[N]o principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them"). So, what appears to have happened is that the plurality has facially invalidated not § 18.2–423, but its own hypothetical interpretation of § 18.2–423, and has then remanded to the Virginia Supreme Court to learn the *actual* interpretation of § 18.2–423. Words cannot express my wonderment at this virtuoso performance.

## III

As the analysis in Part I, *supra*, demonstrates, I believe the prima-facie-evidence provision in Virginia's cross-burning statute is constitutionally unproblematic. Nevertheless, because the Virginia Supreme Court has not yet offered an authoritative construction of § 18.2–423, I concur in the Court's decision to vacate and remand the judgment with respect to respondents Elliott and O'Mara. I also agree that respondent Black's conviction cannot stand. As noted above, the jury in Black's case was instructed that "[t]he burning of a cross, *by itself*, is sufficient evidence from which you may infer the required intent." App. 196 (emphasis

added).   Where this instruction has been given, it is impossible to determine whether the jury has rendered its verdict (as it must) in light of the entire body of facts before it—*including* evidence that might rebut the presumption that the cross burning was done with an intent to intimidate—or, instead, has chosen to ignore such rebuttal evidence and focused exclusively on the fact that the defendant burned a cross.[6]   Still, I cannot go along with the Court's decision to affirm the judgment with respect to Black.   In that judgment, the Virginia Supreme Court, having erroneously concluded that § 18.2–423 is overbroad, not only vacated Black's conviction, but dismissed the indictment against him as well. 262 Va., at 779, 553 S. E. 2d, at 746.   Because I believe the constitutional defect in Black's conviction is rooted in a jury instruction and not in the statute itself, I would not dismiss the indictment and would permit the Commonwealth to retry Black if it wishes to do so.   It is an interesting question whether the plurality's willingness to let the Virginia Supreme Court resolve the plurality's make-believe facial invalidation of the statute extends as well to the facial invalidation insofar as it supports dismissal of the indictment against Black.   Logically, there is no reason why it would not.

JUSTICE SOUTER, with whom JUSTICE KENNEDY and JUSTICE GINSBURG join, concurring in the judgment in part and dissenting in part.

I agree with the majority that the Virginia statute makes a content-based distinction within the category of punishable intimidating or threatening expression, the very type of dis-

---

[6] Though the jury may well have embraced the former (constitutionally permissible) understanding of its duties, that possibility is not enough to dissipate the cloud of constitutional doubt.   See *Sandstrom* v. *Montana*, 442 U. S. 510, 517 (1979) (refusing to assume that the jury embraced a constitutionally sound understanding of an ambiguous instruction: "[W]e cannot discount the possibility that the jury may have interpreted the instruction [improperly]").

tinction we considered in *R. A. V.* v. *St. Paul*, 505 U. S. 377 (1992). I disagree that any exception should save Virginia's law from unconstitutionality under the holding in *R. A. V.* or any acceptable variation of it.

## I

The ordinance struck down in *R. A. V.*, as it had been construed by the State's highest court, prohibited the use of symbols (including but not limited to a burning cross) as the equivalent of generally proscribable fighting words, but the ordinance applied only when the symbol was provocative " 'on the basis of race, color, creed, religion or gender.' " *Id.*, at 380 (quoting St. Paul, Minn., Legis. Code § 292.02 (1990)). Although the Virginia statute in issue here contains no such express "basis of" limitation on prohibited subject matter, the specific prohibition of cross burning with intent to intimidate selects a symbol with particular content from the field of all proscribable expression meant to intimidate. To be sure, that content often includes an essentially intimidating message, that the cross burner will harm the victim, most probably in a physical way, given the historical identification of burning crosses with arson, beating, and lynching. But even when the symbolic act is meant to terrify, a burning cross may carry a further, ideological message of white Protestant supremacy. The ideological message not only accompanies many threatening uses of the symbol, but is also expressed when a burning cross is not used to threaten but merely to symbolize the supremacist ideology and the solidarity of those who espouse it. As the majority points out, the burning cross can broadcast threat and ideology together, ideology alone, or threat alone, as was apparently the choice of respondents Elliott and O'Mara. *Ante*, at 354–357, 363.

The issue is whether the statutory prohibition restricted to this symbol falls within one of the exceptions to *R. A. V.*'s general condemnation of limited content-based proscription

within a broader category of expression proscribable generally. Because of the burning cross's extraordinary force as a method of intimidation, the *R. A. V.* exception most likely to cover the statute is the first of the three mentioned there, which the *R. A. V.* opinion called an exception for content discrimination on a basis that "consists entirely of the very reason the entire class of speech at issue is proscribable." 505 U. S., at 388. This is the exception the majority speaks of here as covering statutes prohibiting "particularly virulent" proscribable expression. *Ante,* at 363.

I do not think that the Virginia statute qualifies for this virulence exception as *R. A. V.* explained it. The statute fits poorly with the illustrative examples given in *R. A. V.,* none of which involves communication generally associated with a particular message, and in fact, the majority's discussion of a special virulence exception here moves that exception toward a more flexible conception than the version in *R. A. V.* I will reserve judgment on that doctrinal development, for even on a pragmatic conception of *R. A. V.* and its exceptions the Virginia statute could not pass muster, the most obvious hurdle being the statute's prima facie evidence provision. That provision is essential to understanding why the statute's tendency to suppress a message disqualifies it from any rescue by exception from *R. A. V.*'s general rule.

## II

*R. A. V.* defines the special virulence exception to the rule barring content-based subclasses of categorically proscribable expression this way: prohibition by subcategory is nonetheless constitutional if it is made "entirely" on the "basis" of "the very reason" that "the entire class of speech at issue is proscribable" at all. 505 U. S., at 388. The Court explained that when the subcategory is confined to the most obviously proscribable instances, "no significant danger of idea or viewpoint discrimination exists," *ibid.,* and the expla-

nation was rounded out with some illustrative examples. None of them, however, resembles the case before us.[1]

The first example of permissible distinction is for a prohibition of obscenity unusually offensive "in its prurience," *ibid.* (emphasis deleted), with citation to a case in which the Seventh Circuit discussed the difference between obscene depictions of actual people and simulations. As that court noted, distinguishing obscene publications on this basis does not suggest discrimination on the basis of the message conveyed. *Kucharek* v. *Hanaway*, 902 F. 2d 513, 517–518 (1990). The opposite is true, however, when a general prohibition of intimidation is rejected in favor of a distinct proscription of intimidation by cross burning. The cross may have been selected because of its special power to threaten, but it may also have been singled out because of disapproval of its message of white supremacy, either because a legislature thought white supremacy was a pernicious doctrine or because it found that dramatic, public espousal of it was a civic embarrassment. Thus, there is no kinship between the cross-burning statute and the core prurience example.

Nor does this case present any analogy to the statute prohibiting threats against the President, the second of *R. A. V.*'s examples of the virulence exception and the one the majority relies upon. *Ante,* at 362. The content discrimination in that statute relates to the addressee of the threat and reflects the special risks and costs associated with threatening the President. Again, however, threats against the President are not generally identified by reference to the content of any message that may accompany the threat, let alone any viewpoint, and there is no obvious correlation in fact between victim and message. Millions of statements are made about the President every day on every subject

---

[1] Although three examples are given, the third may be skipped here. It covers misleading advertising in a particular industry in which the risk of fraud is thought to be great, and thus deals with commercial speech with its separate doctrine and standards. *R. A. V.,* 505 U. S., at 388–389.

and from every standpoint; threats of violence are not an integral feature of any one subject or viewpoint as distinct from others. Differential treatment of threats against the President, then, selects nothing but special risks, not special messages. A content-based proscription of cross burning, on the other hand, may be a subtle effort to ban not only the intensity of the intimidation cross burning causes when done to threaten, but also the particular message of white supremacy that is broadcast even by nonthreatening cross burning.

I thus read *R. A. V.*'s examples of the particular virulence exception as covering prohibitions that are not clearly associated with a particular viewpoint, and that are consequently different from the Virginia statute. On that understanding of things, I necessarily read the majority opinion as treating *R. A. V.*'s virulence exception in a more flexible, pragmatic manner than the original illustrations would suggest. *Ante,* at 363. Actually, another way of looking at today's decision would see it as a slight modification of *R. A. V.*'s third exception, which allows content-based discrimination within a proscribable category when its "nature" is such "that there is no realistic possibility that official suppression of ideas is afoot." *R. A. V., supra,* at 390. The majority's approach could be taken as recognizing an exception to *R. A. V.* when circumstances show that the statute's ostensibly valid reason for punishing particularly serious proscribable expression probably is not a ruse for message suppression, even though the statute may have a greater (but not exclusive) impact on adherents of one ideology than on others, *ante,* at 362–363.

### III

My concern here, in any event, is not with the merit of a pragmatic doctrinal move. For whether or not the Court should conceive of exceptions to *R. A. V.*'s general rule in a more practical way, no content-based statute should survive even under a pragmatic recasting of *R. A. V.* without a high probability that no "official suppression of ideas is afoot,"

505 U. S., at 390. I believe the prima facie evidence provision stands in the way of any finding of such a high probability here.

Virginia's statute provides that burning a cross on the property of another, a highway, or other public place is "prima facie evidence of an intent to intimidate a person or group of persons." Va. Code Ann. § 18.2–423 (1996). While that language was added by amendment to the earlier portion of the statute criminalizing cross burning with intent to intimidate, *ante*, at 363 (plurality opinion), it was a part of the prohibitory statute at the time these respondents burned crosses, and the whole statute at the time of respondents' conduct is what counts for purposes of the First Amendment.

As I see the likely significance of the evidence provision, its primary effect is to skew jury deliberations toward conviction in cases where the evidence of intent to intimidate is relatively weak and arguably consistent with a solely ideological reason for burning. To understand how the provision may work, recall that the symbolic act of burning a cross, without more, is consistent with both intent to intimidate and intent to make an ideological statement free of any aim to threaten. *Ante*, at 354–357. One can tell the intimidating instance from the wholly ideological one only by reference to some further circumstance. In the real world, of course, and in real-world prosecutions, there will always be further circumstances, and the factfinder will always learn something more than the isolated fact of cross burning. Sometimes those circumstances will show an intent to intimidate, but sometimes they will be at least equivocal, as in cases where a white supremacist group burns a cross at an initiation ceremony or political rally visible to the public. In such a case, if the factfinder is aware of the prima facie evidence provision, as the jury was in respondent Black's case, *ante*, at 349–350, the provision will have the practical effect of tilting the jury's thinking in favor of the prosecution. What is significant is not that the provision

permits a factfinder's conclusion that the defendant acted with proscribable and punishable intent without any further indication, because some such indication will almost always be presented. What is significant is that the provision will encourage a factfinder to err on the side of a finding of intent to intimidate when the evidence of circumstances fails to point with any clarity either to the criminal intent or to the permissible one. The effect of such a distortion is difficult to remedy, since any guilty verdict will survive sufficiency review unless the defendant can show that, "viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson* v. *Virginia*, 443 U. S. 307, 319 (1979). The provision will thus tend to draw nonthreatening ideological expression within the ambit of the prohibition of intimidating expression, as JUSTICE O'CONNOR notes. *Ante*, at 365–366 (plurality opinion).

To the extent the prima facie evidence provision skews prosecutions, then, it skews the statute toward suppressing ideas. Thus, the appropriate way to consider the statute's prima facie evidence term, in my view, is not as if it were an overbroad statutory definition amenable to severance or a narrowing construction. The question here is not the permissible scope of an arguably overbroad statute, but the claim of a clearly content-based statute to an exception from the general prohibition of content-based proscriptions, an exception that is not warranted if the statute's terms show that suppression of ideas may be afoot. Accordingly, the way to look at the prima facie evidence provision is to consider it for any indication of what is afoot. And if we look at the provision for this purpose, it has a very obvious significance as a mechanism for bringing within the statute's prohibition some expression that is doubtfully threatening though certainly distasteful.

It is difficult to conceive of an intimidation case that could be easier to prove than one with cross burning, assum-

ing any circumstances suggesting intimidation are present. The provision, apparently so unnecessary to legitimate prosecution of intimidation, is therefore quite enough to raise the question whether Virginia's content-based statute seeks more than mere protection against a virulent form of intimidation. It consequently bars any conclusion that an exception to the general rule of *R. A. V.* is warranted on the ground "that there is no realistic [or little realistic] possibility that official suppression of ideas is afoot," 505 U. S., at 390.[2] Since no *R. A. V.* exception can save the statute as content based, it can only survive if narrowly tailored to serve a compelling state interest, *id.*, at 395–396, a stringent test the statute cannot pass; a content-neutral statute banning intimidation would achieve the same object without singling out particular content.

## IV

I conclude that the statute under which all three of the respondents were prosecuted violates the First Amendment, since the statute's content-based distinction was invalid at the time of the charged activities, regardless of whether the prima facie evidence provision was given any effect in any respondent's individual case. In my view, severance of the prima facie evidence provision now could not eliminate the unconstitutionality of the whole statute at the time of the respondents' conduct. I would therefore affirm the judgment of the Supreme Court of Virginia vacating the respondents' convictions and dismissing the indictments. Accordingly, I concur in the Court's judgment as to respondent Black and dissent as to respondents Elliott and O'Mara.

---

[2] The same conclusion also goes for the second *R. A. V.* exception relating to "'secondary effects.'" 505 U. S., at 389 (citing *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 48 (1986)). Our "secondary effects" jurisprudence presupposes that the regulation at issue is "unrelated to the suppression of free expression." *Ibid.*

JUSTICE THOMAS, dissenting.

In every culture, certain things acquire meaning well beyond what outsiders can comprehend. That goes for both the sacred, see *Texas* v. *Johnson*, 491 U. S. 397, 422–429 (1989) (REHNQUIST, C. J., dissenting) (describing the unique position of the American flag in our Nation's 200 years of history), and the profane. I believe that cross burning is the paradigmatic example of the latter.

## I

Although I agree with the majority's conclusion that it is constitutionally permissible to "ban . . . cross burning carried out with the intent to intimidate," *ante*, at 363, I believe that the majority errs in imputing an expressive component to the activity in question, see *ante*, at 362 (relying on one of the exceptions to the First Amendment's prohibition on content-based discrimination outlined in *R. A. V.* v. *St. Paul*, 505 U. S. 377 (1992)). In my view, whatever expressive value cross burning has, the legislature simply wrote it out by banning only intimidating conduct undertaken by a particular means. A conclusion that the statute prohibiting cross burning with intent to intimidate sweeps beyond a prohibition on certain conduct into the zone of expression overlooks not only the words of the statute but also reality.

## A

"In holding [the ban on cross burning with intent to intimidate] unconstitutional, the Court ignores Justice Holmes' familiar aphorism that 'a page of history is worth a volume of logic.'" *Texas* v. *Johnson, supra*, at 421 (REHNQUIST, C. J., dissenting) (quoting *New York Trust Co.* v. *Eisner*, 256 U. S. 345, 349 (1921)).

> "The world's oldest, most persistent terrorist organization is not European or even Middle Eastern in origin. Fifty years before the Irish Republican Army was orga-

nized, a century before Al Fatah declared its holy war on Israel, the Ku Klux Klan was actively harassing, torturing, and murdering in the United States. Today . . . its members remain fanatically committed to a course of violent opposition to social progress and racial equality in the United States." M. Newton & J. Newton, The Ku Klux Klan: An Encyclopedia vii (1991) (hereinafter Newton & Newton).

To me, the majority's brief history of the Ku Klux Klan only reinforces this common understanding of the Klan as a terrorist organization, which, in its endeavor to intimidate, or even eliminate those it dislikes, uses the most brutal of methods.

Such methods typically include cross burning—"a tool for the intimidation and harassment of racial minorities, Catholics, Jews, Communists, and any other groups hated by the Klan." *Capitol Square Review and Advisory Bd.* v. *Pinette,* 515 U. S. 753, 770 (1995) (THOMAS, J., concurring). For those not easily frightened, cross burning has been followed by more extreme measures, such as beatings and murder. J. Williams, Eyes on the Prize: America's Civil Rights Years, 1954–1965, p. 39 (1987). As the Government points out, the association between acts of intimidating cross burning and violence is well documented in recent American history. Brief for United States as *Amicus Curiae* 3–4, and n. 2.[1]

---

[1] *United States* v. *Guest,* 383 U. S. 745, 747–748, n. 1 (1966) (quoting indictment charging conspiracy under 18 U. S. C. §241 (1964 ed.) to interfere with federally secured rights by, *inter alia,* "burning crosses at night in public view," "shooting Negroes," "beating Negroes," "killing Negroes," "damaging and destroying property of Negroes," and "pursuing Negroes in automobiles and threatening them with guns"); *United States* v. *Pospisil,* 186 F. 3d 1023, 1027 (CA8 1999) (defendants burned a cross in victims' yard, slashed their tires, and fired guns), cert. denied, 529 U. S. 1089 (2000); *United States* v. *Stewart,* 65 F. 3d 918, 922 (CA11 1995) (cross burning precipitated an exchange of gunfire between victim and perpetrators), cert. denied *sub nom. Daniel* v. *United States,* 516 U. S. 1134 (1996); *United States* v. *McDermott,* 29 F. 3d 404, 405 (CA8 1994) (defendants

Indeed, the connection between cross burning and violence is well ingrained, and lower courts have so recognized:

"After the mother saw the burning cross, she was crying on her knees in the living room. [She] felt feelings of frustration and intimidation and feared for her husband's life. She testified what the burning cross symbolized to her as a black American: 'Nothing good. Murder, hanging, rape, lynching. Just anything bad

sought to discourage blacks from using public park by burning a cross in the park, as well as by "waving baseball bats, axe handles, and knives; throwing rocks and bottles; veering cars towards black persons; and physically chasing black persons out of the park"); *Cox* v. *State,* 585 So. 2d 182, 202 (Ala. Crim. App. 1991) (defendant participated in evening of cross burning and murder), cert. denied, 503 U. S. 987 (1992); R. Caro, The Years of Lyndon Johnson: Master of the Senate 847 (2002) (referring to a wave of "southern bombings, beatings, sniper fire, and cross-burnings" in late 1956 in response to efforts to desegregate schools, buses, and parks); Newton & Newton 21 (observing that "Jewish merchants were subjected to boycotts, threats, cross burnings, and sometimes acts of violence" by the Klan and its sympathizers); *id.,* at 361–362 (describing cross burning and beatings directed at a black family that refused demands to sell the home); *id.,* at 382 (describing incident of cross burning and brick throwing at home of Jewish officeholder); *id.,* at 583 (describing campaign of cross burning and property damage directed at Vietnamese immigrant fishermen); W. Wade, The Fiery Cross: The Ku Klux Klan in America 262–263 (1987) (describing incidents of cross burning, beatings, kidnaping, and other "terrorism" directed against union organizers in the South); *id.,* at 376 (cross burnings associated with shooting into cars); *id.,* at 377 (cross burnings associated with assaults on blacks); 1 R. Kluger, Simple Justice 378 (1975) (describing cross burning at, and subsequent shooting into, home of federal judge who issued desegregation decisions); Rubinowitz & Perry, Crimes Without Punishment: White Neighbors' Resistance to Black Entry, 92 J. Crim. L. & C. 335, 342, 354–355, 388, 408–410, 419, 420, 421, 423 (Fall 2001–Winter 2002) (noting that an "escalating campaign to eject a [minority] family" from a white neighborhood could begin with "cross burnings, window breaking, or threatening telephone calls," and culminate with bombings; describing other incidents of cross burning accompanied by violence); Cross Burned at Manakin, Third in Area, Richmond Times-Dispatch, Feb. 26, 1951, p. 4, App. 318 (describing 1951 Virginia cross burning accompanied by gunfire).

that you can name. It is the worst thing that could happen to a person.' . . . Mr. Heisser told the probation officer that at the time of the occurrence, if the family did not leave, he believed someone would return to commit murder. . . . *Seven months after the incident, the family still lived in fear. . . . This is a reaction reasonably to be anticipated from this criminal conduct.*" *United States* v. *Skillman,* 922 F. 2d 1370, 1378 (CA9 1991) (emphasis added).

But the perception that a burning cross is a threat and a precursor of worse things to come is not limited to blacks. Because the modern Klan expanded the list of its enemies beyond blacks and "radical[s]" to include Catholics, Jews, most immigrants, and labor unions, Newton & Newton ix, a burning cross is now widely viewed as a signal of impending terror and lawlessness. I wholeheartedly agree with the observation made by the Commonwealth of Virginia:

"A white, conservative, middle-class Protestant, waking up at night to find a burning cross outside his home, will reasonably understand that someone is threatening him. His reaction is likely to be very different than if he were to find, say, a burning circle or square. In the latter case, he may call the fire department. In the former, he will probably call the police." Brief for Petitioner 26.

In our culture, cross burning has almost invariably meant lawlessness and understandably instills in its victims well-grounded fear of physical violence.

## B

Virginia's experience has been no exception. In Virginia, though facing widespread opposition in the 1920's, the Klan developed localized strength in the southeastern part of the Commonwealth, where there were reports of scattered raids and floggings. Newton & Newton 585. Although the Klan was disbanded at the national level in 1944, *ibid.,* a series of

cross burnings in Virginia took place between 1949 and 1952. See 262 Va. 764, 771, n. 2, 553 S. E. 2d 738, 742, n. 2 (2001) (collecting newspaper accounts of cross burnings in Virginia during that time period); see also Cross Fired Near Suffolk Stirs Probe, Burning Second in Past Week, Richmond Times-Dispatch, Jan. 23, 1949, section 2, p. 1, App. 313, 314–315 (The second reported cross burning within a week in 1949 "brought to eight the number which have occurred in Virginia during the past year. Six of the incidents have occurred in Nansemond County. Four crosses were burned near Suffolk last Spring, and about 150 persons took part in the December 11 cross burning near Whaleyville. No arrests have been made in connection with any of the incidents").

Most of the crosses were burned on the lawns of black families, who either were business owners or lived in predominantly white neighborhoods. See Police Aid Requested by Teacher, Cross is Burned in Negro's Yard, Richmond News Leader, Jan. 21, 1949, p. 19, App. 312; Cross Fired Near Suffolk Stirs Probe, Burning Second in Past Week, *supra*, at 313; Cross is Burned at Reedville Home, Richmond News Leader, Apr. 14, 1951, p. 1, App. 321. At least one of the cross burnings was accompanied by a shooting. Cross Burned at Manakin, Third in Area, *supra* n. 1, at 318. The crosses burned near residences were about five to six feet tall, while a "huge cross reminiscent of the Ku Klux Klan days" that burned "atop a hill" as part of the initiation ceremony of the secret organization of the Knights of Kavaliers was 12 feet tall. Huge Cross is Burned on Hill Just South of Covington, Richmond Times-Dispatch, Apr. 14, 1950, p. 6, App. 316. These incidents were, in the words of the time, "*terroristic [sic]*" and "un-American act[s], designed to *intimidate* Negroes from seeking their rights as citizens." Cross Fired Near Suffolk Stirs Probe, Burning Second in Past Week, *supra*, at 315 (emphasis added).

In February 1952, in light of this series of cross burnings and attendant reports that the Klan, "long considered dead in Virginia, is being revitalized in Richmond," Governor Battle announced that "Virginia 'might well consider passing legislation' to restrict the activities of the Ku Klux Klan." "State Might Well Consider" Restrictions on Ku Klux Klan, Governor Battle Comments, Richmond Times-Dispatch, Feb. 6, 1952, p. 7, App. 321. As newspapers reported at the time, the bill was "to ban the burning of crosses and other similar evidences of *terrorism*." Name Rider Approved by House, Richmond News Leader, Feb. 23, 1952, p. 1, App. 325 (emphasis added). The bill was presented to the House of Delegates by a former FBI agent and future two-term Governor, Delegate Mills E. Godwin, Jr. "Godwin said law and order in the State were impossible if organized groups could *create fear by intimidation*." Bill to Curb KKK Passed By the House, Action is Taken Without Debate, Richmond Times-Dispatch, Mar. 8, 1952, p. 5, App. 325 (emphasis added).

That in the early 1950's the people of Virginia viewed cross burning as creating an intolerable atmosphere of terror is not surprising: Although the cross took on some religious significance in the 1920's when the Klan became connected with certain southern white clergy, by the postwar period it had reverted to its original function "as an instrument of intimidation." W. Wade, The Fiery Cross: The Ku Klux Klan in America 185, 279 (1987).

Strengthening Delegate Godwin's explanation, as well as my conclusion, that the legislature sought to criminalize terrorizing *conduct* is the fact that at the time the statute was enacted, racial segregation was not only the prevailing practice, but also the law in Virginia.[2] And, just two years

---

[2] See, *e. g.*, Va. Code Ann. § 18–327 (1950) (repealed 1960) (required separation of "white" and "colored" at any place of entertainment or other public assemblage; violation was misdemeanor); Va. Code Ann. § 20–54 (1960) (repealed 1968) (prohibited racial intermarriage); Va. Code Ann. § 22–221 (1969) (repealed 1972) ("White and colored persons shall not be

after the enactment of this statute, Virginia's General Assembly embarked on a campaign of "massive resistance" in response to *Brown* v. *Board of Education,* 347 U. S. 483 (1954). See generally *Griffin* v. *School Bd. of Prince Edward Cty.,* 377 U. S. 218, 221 (1964); *Harrison* v. *Day,* 200 Va. 439, 448–454, 106 S. E. 2d 636, 644–648 (1959) (describing massive resistance as legislatively mandated attempt to close public schools rather than desegregate).

It strains credulity to suggest that a state legislature that adopted a litany of segregationist laws self-contradictorily intended to squelch the segregationist message. Even for segregationists, violent and terroristic conduct, the Siamese twin of cross burning, was intolerable. The ban on cross burning with intent to intimidate demonstrates that even segregationists understood the difference between intimidating and terroristic conduct and racist expression. It is simply beyond belief that, in passing the statute now under review, the Virginia Legislature was concerned with anything but penalizing conduct it must have viewed as particularly vicious.

Accordingly, this statute prohibits only conduct, not expression. And, just as one cannot burn down someone's house to make a political point and then seek refuge in the First Amendment, those who hate cannot terrorize and intimidate to make their point. In light of my conclusion that

---

taught in the same school"); Va. Code Ann. § 24–120 (1969) (repealed 1970) (required separate listings for "white and colored persons" who failed to pay poll tax); Va. Code Ann. § 38–281 (1950) (repealed 1952) (prohibited fraternal associations from having "both white and colored members"); Va. Code Ann. § 53–42 (1967) (amended to remove "race" 1968) (required racial separation in prison); Va. Code Ann. § 56–114 (1974) (repealed 1975) (authorized State Corporation Commission to require "separate waiting rooms" for "white and colored races"); Va. Code Ann. § 56–326 (1969) (repealed 1970) (required motor carriers to "separate" their "white and colored passengers," violation was misdemeanor); §§ 56–390 and 56–396 (repealed 1970) (same for railroads); § 58–880 (repealed 1970) (required separate personal property tax books for "white[s]" and "colored").

the statute here addresses only conduct, there is no need to analyze it under any of our First Amendment tests.

## II

Even assuming that the statute implicates the First Amendment, in my view, the fact that the statute permits a jury to draw an inference of intent to intimidate from the cross burning itself presents no constitutional problems. Therein lies my primary disagreement with the plurality.

## A

"The threshold inquiry in ascertaining the constitutional analysis applicable to [a jury instruction involving a presumption] is to determine the nature of the presumption it describes." *Francis* v. *Franklin,* 471 U. S. 307, 313–314 (1985) (internal quotation marks omitted). We have categorized the presumptions as either permissive inferences or mandatory presumptions. *Id.,* at 314.

To the extent we do have a construction of this statute by the Virginia Supreme Court, we know that both the majority and the dissent agreed that the presumption was "a statutorily supplied *inference,*" 262 Va., at 778, 553 S. E. 2d, at 746 (emphasis added); *id.,* at 795, 553 S. E. 2d, at 755 (Hassell, J., dissenting) ("Code § 18.2–423 creates a statutory *inference*" (emphasis added)). Under Virginia law, the term "inference" has a well-defined meaning and is distinct from the term "presumption." *Martin* v. *Phillips,* 235 Va. 523, 526, 369 S. E. 2d 397, 399 (1988).

> "A presumption is a rule of law that compels the fact finder to draw a certain conclusion or a certain inference from a given set of facts.[1] The primary significance of a presumption is that it operates to shift to the opposing party the burden of producing evidence tending to rebut the presumption.[2] No presumption, however, can operate to shift the ultimate burden of persuasion from the party upon whom it was originally cast.

"¹In contrast, *an inference*, sometimes loosely referred to as a presumption of fact, *does not compel a specific conclusion. An inference merely applies to the rational potency or probative value of an evidentiary fact to which the fact finder may attach whatever force or weight it deems best.* 9 J. Wigmore, Evidence in Trials at Common Law § 2491(1), at 304 (Chad. rev. 1981).

"²*An inference, on the other hand, does not invoke this procedural consequence of shifting the burden of production. Id.*"

*Ibid.* (some citations omitted; emphasis added).

Both the majority and the dissent below classified the clause in question as an "inference," and I see no reason to disagree, particularly in light of the instructions given to the jury in Black's case, requiring it to find guilt beyond a reasonable doubt both as to the fact that "the defendant burned or caused to be burned a cross in a public place," and that "he did so with the intent to intimidate any person or group of persons," 262 Va., at 796, 553 S. E. 2d, at 756 (Hassell, J., dissenting) (quoting jury instructions in Black's case).

Even though under Virginia law the statutory provision at issue here is characterized as an "inference," the Court must still inquire whether the label Virginia attaches corresponds to the categorization our cases have given such clauses. In this respect, it is crucial to observe that what Virginia law calls an "inference" is what our cases have termed a "permissive inference or presumption." *County Court of Ulster Cty.* v. *Allen,* 442 U. S. 140, 157 (1979).³ Given that this

---

³ As the Court explained in *Allen,* a permissive inference or presumption "allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant. In that situation the basic fact may constitute prima facie evidence of the elemental fact. . . . Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permit-

Court's definitions of a "permissive inference" and a "mandatory presumption" track Virginia's definitions of "inference" and "presumption," the Court should judge the Virginia statute based on the constitutional analysis applicable to "inferences": they raise no constitutional flags unless there is "no rational way the trier could make the connection permitted by the inference." *Ibid.* As explained in Part I, *supra, not* making a connection between cross burning and intimidation would be irrational.

But even with respect to statutes containing a mandatory irrebuttable presumption as to intent, the Court has not shown much concern. For instance, there is no scienter requirement for statutory rape. See, *e. g.*, Tenn. Code Ann. § 39–13–506 (1997); Ore. Rev. Stat. Ann. § 163.365 (1989); Mo. Rev. Stat. § 566.032 (2000); Ga. Code Ann. § 16–6–3 (1996). That is, a person can be arrested, prosecuted, and convicted for having sex with a minor, without the government ever producing any evidence, let alone proving beyond a reasonable doubt, that a minor did not consent. In fact, "[f]or purposes of the child molesting statute . . . consent is irrelevant. The legislature has determined in such cases that children under the age of sixteen (16) cannot, as a matter of law, consent to have sexual acts performed upon them, or consent to engage in a sexual act with someone over the age of sixteen (16)." *Warrick* v. *State*, 538 N. E. 2d 952, 954 (Ind. App. 1989) (citing Ind. Code § 35–42–4–3 (1988)). The legislature finds the behavior so reprehensible that the intent is satisfied by the mere act committed by a perpetrator. Considering

---

ted by the inference." 442 U. S., at 157 (citations omitted). By contrast, "[a] mandatory presumption . . . may affect not only the strength of the 'no reasonable doubt' burden but also the placement of that burden; it tells the trier that he or they *must* find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts." *Ibid.*

the horrific effect cross burning has on its victims, it is also reasonable to presume intent to intimidate from the act itself.

Statutes prohibiting possession of drugs with intent to distribute operate much the same way as statutory rape laws. Under these statutes, the intent to distribute is effectively satisfied by possession of some threshold amount of drugs. See, *e. g.*, Del. Code Ann., Tit. 16, § 4753A (1987); Mass. Gen. Laws, ch. 94C, § 32E (West 1997); S. C. Code Ann. § 44–53–370 (West 2000). As with statutory rape, the presumption of intent in such statutes is irrebuttable—not only can a person be arrested for the crime of possession with intent to distribute (or "trafficking") without any evidence of intent beyond quantity of drugs, but such person cannot even mount a defense to the element of intent. However, as with statutory rape statutes, our cases do not reveal any controversy with respect to the presumption of intent in these drug statutes.

Because the prima facie clause here is an inference, not an irrebuttable presumption, there is all the more basis under our due process precedents to sustain this statute.

## B

The plurality, however, is troubled by the presumption because this is a First Amendment case. The plurality laments the fate of an innocent cross burner who burns a cross, but does so without an intent to intimidate. The plurality fears the chill on expression because, according to the plurality, the inference permits "the Commonwealth to arrest, prosecute, and convict a person based solely on the fact of cross burning itself." *Ante*, at 365. First, it is, at the very least, unclear that the inference comes into play during arrest and initiation of a prosecution, that is, prior to the instructions stage of an actual trial. Second, as I explained above, the inference is rebuttable and, as the jury instructions given in this case demonstrate, Virginia law still re-

quires the jury to find the existence of each element, including intent to intimidate, beyond a reasonable doubt.

Moreover, even in the First Amendment context, the Court has upheld such regulations where conduct that initially appears culpable ultimately results in dismissed charges. A regulation of pornography is one such example. While possession of child pornography is illegal, *New York* v. *Ferber,* 458 U. S. 747, 764 (1982), possession of adult pornography, as long as it is not obscene, is allowed, *Miller* v. *California,* 413 U. S. 15 (1973). As a result, those pornographers trafficking in images of adults who look like minors may be not only deterred but also arrested and prosecuted for possessing what a jury might find to be legal materials. This "chilling" effect has not, however, been a cause for grave concern with respect to overbreadth of such statutes among the Members of this Court.

That the First Amendment gives way to other interests is not a remarkable proposition. What is remarkable is that, under the plurality's analysis, the determination whether an interest is sufficiently compelling depends not on the harm a regulation in question seeks to prevent, but on the area of society at which it aims. For instance, in *Hill* v. *Colorado,* 530 U. S. 703 (2000), the Court upheld a restriction on protests near abortion clinics, explaining that the State had a legitimate interest, which was sufficiently narrowly tailored, in protecting those seeking services of such establishments from "unwanted advice" and "unwanted communication," *id.,* at 708, 716, 717, 729. In so concluding, the Court placed heavy reliance on the "vulnerable physical and emotional conditions" of patients. *Id.,* at 729. Thus, when it came to the rights of those seeking abortions, the Court deemed restrictions on "unwanted advice," which, notably, can be given only from a distance of at least eight feet from a prospective patient, justified by the countervailing interest in obtaining an abortion. Yet, here, the plurality strikes down the statute because one day an individual might wish to burn a cross,

but might do so without an intent to intimidate anyone. That cross burning subjects its targets, and, sometimes, an unintended audience, see 262 Va., at 782, 553 S. E. 2d, at 748–749 (Hassell, J., dissenting); see also App. 93–97, to extreme emotional distress, and is virtually never viewed merely as "unwanted communication," but rather, as a physical threat, is of no concern to the plurality. Henceforth, under the plurality's view, physical safety will be valued less than the right to be free from unwanted communications.

## III

Because I would uphold the validity of this statute, I respectfully dissent.