*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CNN,

Petitioner-Appellee,

v

SEB,

Respondent-Appellant.

FOR PUBLICATION
January 12, 2023
9:05 a.m.

No. 359007
Berrien Circuit Court
LC No. 21-003087-PH

Before: GLEICHER, C.J., and MARKEY and RICK, JJ.

GLEICHER, C.J.

CNN and SEB are neighbors who share a driveway. For years, their families have feuded about the driveway's use. The conflicts spilled into the circuit court through repeated requests for personal protection orders (PPOs). The court finally granted the PPO challenged here, citing SEB's odious and racially charged comments. While ugly, rude, and insensitive, SEB's statements fell within the range of expression protected by the First Amendment. We vacate and remand for further proceedings.

## I. BACKGROUND

CNN and SEB live in neighboring homes with their husbands, MN and EB. The homes share a driveway. A mutual easement was formally put in place by both families' predecessors in interest. Despite this documented arrangement, the parties relentlessly quarreled about the driveway's use. Other family members and neighbors were pulled into the disagreement, creating warring factions. Battles raged on issues ranging from installing chicken wire fences to hanging surveillance cameras from trees, sometimes leading to screaming matches in the street.

The parties summoned the police several times. In 2020 and 2021, the neighbors filed five separate PPO actions. One alleged that SEB was fearful of MN.[1]

---

[1] The trial court did not indicate whether these prior actions resulted in PPOs.

The incident triggering the current filing arose on August 8, 2021, when MN parked his car in the driveway directly in front of his garage and began vacuuming the inside, with his back turned to SEB's property. From her porch, CNN observed SEB approach MN to take cell phone pictures of him. CNN walked over and stood between SEB and MN. She repeatedly told SEB to go away. SEB's sister, RJ, and EB joined the gathering. Another neighbor, LM, heard the argument and drew near to assist CNN and MN. When LM came outside, SEB shouted, "[H]ere come your masser (sic)." (LM is white; CNN, SEB and their husbands are African American.) CNN and LM reported that SEB and EB repeated the comment approximately four times. LM returned to his house. CNN told SEB that her comment was "foul." SEB then made a motion "like she was trying to . . . come at" CNN. RJ grabbed SEB's arm to stop her and SEB tried to pull loose. CNN asked SEB, "[W]hat are you doing? What is that you want[?] You want to come at me[?]" CNN and MN then turned away and returned to their homes.

About an hour later, a blue car pulled into the driveway. SEB's nephew, SS, "jump[ed] out" of the vehicle and yelled "you better not threaten my aunt and you better not come after my aunt." CNN attributed a nondescript threat to SS—"I'm coming and da, da, da, da and I'll do this." CNN subsequently admitted that she did not hear SS's comments and was giving only a second-hand account.

Before CNN and MN could respond, the police arrived. CNN and MN remained on their porch while the police spoke to SEB and her family members. An officer asked CNN and MN to identify the location of the encounter. SEB and her family members continued to yell at CNN and MN as they spoke to the police. CNN testified that "they started yelling and hollering you know and intimidating." The officer directed SEB and her family members to stop. CNN then asked if they could finish the conversation with the officer on their porch because the reaction of SEB and her family members made them "nervous."

As to the string of encounters between the two households over the years, CNN summarized:

> Why is this happening? And it has been happening for years. And quite frankly, it happens often when [MN] is not there and I am by myself.
>
> And it is frightening.

More specifically, CNN indicated, "I am fearful about what happened on that date; quite fearful."

At the onset of the PPO hearing, the court reminded the parties that it had presided over the five previous PPO proceedings and was very familiar with their history:

> I am familiar with both of the parties. We have had a number of hearing[s], I think that I recall five or six individual files that I have personally been involved with on [PPOs] that are related to the . . . two households. They are not necessarily between these two parties individually, but they are related to either spouses or friends or family related to these two parties.
>
> So, I do not need, for purposes of today's hearing, either of you to - - I have and can take judicial notice of the record that has already existed.

So, I am not going to hear a lot of testimony about what happened in 2019 or 2020, all right, because . . . I have already heard that testimony. I have already . . . seen that evidence and . . . it puts things into context.

I am well aware that the two parties have had ongoing issues.

Okay, so I don't need to consider that again for purposes of this [PPO]. . . .

* * *

I don't mind context, but I am not going to rehear these cases again.

The court took testimony from CNN and SEB. LM, RJ, EB, and SS testified as well; MN was not present. As CNN began to testify, the court reminded her that she could discuss past incidents, but only to the extent they involved contacts between CNN and SEB themselves. CNN described the incident on August 8, 2021, as detailed above. She also described an incident in the spring of 2021, when SEB and EB attempted to install a chicken wire barrier on the driveway. CNN was pulling out of the driveway and did not see her neighbors. CNN almost hit SEB with her car. When CNN rolled down her window to apologize, SEB was "screaming" and "[came] at" CNN's vehicle. EB "grabbed her arm and he pulled her back." CNN described that the incident "scared" her and made her "very nervous."

CNN recounted an incident in the fall in which SEB and EB entered CNN's property to accost LM about a brush pile that was spilling over onto SEB's land. CNN intervened and SEB turned on her. SEB was "very volatile" and "aggressive." SEB "approach[ed] like she [was] coming at [CNN]" and EB had to stop SEB.

Before entering its ruling on the record, the court advised the parties of the legal standards applicable in a PPO case, opening with, "As you will recall, possibly from prior hearings if you were here." The court reiterated "the relatively extensive history between the two households," reminding the parties that only contact specifically between CNN and SEB was relevant. The court also highlighted that "there may be other relief that the parties can seek" outside of a PPO, including a civil declaration regarding "easement lines, property lines, trespass" or "nuisance." Regarding the factual basis of the parties' history, the court recounted:

The parties, in some respects, I think up until this recent time where [CNN] has filed, they have been - - the petitioner has always been either [EB] or [SEB] against either [MN.] I believe [CNN's] daughter, I think that her name was [M] - - that is one of the files - - and then an additional neighbor, I think that her name was [HB] - - I think at some point there was one.

So I have, just for the record, cases 2020-2592; 2020-2643; 2020-2593 as our 2020 cases. And then there was 2021-2439 and 2021-2440; those were the two filed by [SEB and EB] against [MN], most recently is the first filing by [CNN] in filing 2021-2982; that was an ex parte and instead of just setting a hearing for that one, a separate file was created and that is this current one that we have.

-3-

> So, the Court, with respect to prior contact between [CNN] and [SEB], we do have . . . some record of contact between the two. [CNN] did highlight a couple of instances and testified to those. [SEB] testified as well on her recollection with respect to a couple of the other incidences.

The court noted that some other incidents described by the parties were "separate civil matters" and not relevant to the PPO standards.

> But [those incidents] certainly set[] a tone of contact between these parties and I have treated each petition, really, separately in terms of the contact as these parties will recall from those prior hearings.

> The focus today would then be on the repeated and continuing contact between these two parties. And I did hear from [LM] as I stated; [CNN] for the petitioner.

> I also heard from [RJ], [SEB's] sister and then [EB]; as well as [SS], the nephew and then finally heard from [SEB].

> The focus of today, besides the prior contact, and the [sic] between these parties is really the incident of August 8th. And sometimes even a single incident can be - - can cause that and in this instance we do have a history between these parties and words being exchanged.

> There was testimony from [SEB] regarding certain things that she had said including that she admitting [sic] that she had called [CNN] wicked before. That she had also written words, I think, even in one of the cases regarding her status and with reference to her being racist or acting in a racial manner, . . . favoring lighter skinned African American versus darker skinned African American.

> And so there is that - - that history, but the focus of today's testimony from all of the witnesses was really this incident of August 8th.

> And it is after hearing the testimony there . . . is some differences between who was standing where and at what point; but the important part, for purposes of the hearing today, is really the exchange, again, between the parties.

The court characterized SEB's statement—"here comes your master"—as "racially charged" and "hate speech." "That is harassment, possibly of the worst kind, in this day and age, in this time of insensitivity to everyone that you can have that in your heart to utter in the heat of the moment, is very unfortunate[]." The court found it be "blatant harassment that rises to the level of a definition under the statute. It is not protected speech and it doesn't matter where you are standing."

The court admonished SEB for approaching MN while he was "standing in his garage" vacuuming his vehicle, an act that had no effect at all on SEB's property, especially given that SEB had "filed multiple PPO's saying that [she is] afraid of [MN]."

At the close of the hearing, the court entered the PPO prohibiting SEB from "sending mail or other communications" to CNN, "contacting [CNN] by telephone," "placing an object on or delivering an object to" CNN's property, "threatening to kill or physically injure" CNN, "speaking to [CNN] in any place or location," and photographing CNN or her vehicle.

SEB appeals.

## II. ANALYSIS

On appeal, SEB raises several challenges to the issuance of the PPO. SEB contends that the trial court misstated the law regarding the evidence necessary to support the issuance of a PPO. She also argues that as the court determined that the other incidents cited by CNN were "separate civil matters," the court did not find two or more acts as required to secure a PPO. Finally, SEB contends that her speech was constitutionally protected and therefore not "harassment" as defined in the statute.

We review for an abuse of discretion a trial court's decision to issue a PPO, but review for clear error the court's underlying factual findings. *Hayford v Hayford*, 279 Mich App 324, 325; 760 NW2d 503 (2008). "The burden of proof in obtaining [a] PPO . . . is on the applicant for the restraining order." *Pickering v Pickering*, 253 Mich App 694, 701; 659 NW2d 649 (2002), citing *Kampf v Kampf*, 237 Mich App 377, 385-386; 603 NW2d 295 (1999); MCR 3.310(B)(5).

MCL 600.2950a(1) sets forth the criteria under which a trial court may issue a nondomestic PPO, in relevant part, as follows:

> Except as provided in subsections (27), (28), and (30), by commencing an independent action to obtain relief under this section, . . . an individual may petition the family division of circuit court to enter a [PPO] to restrain or enjoin an individual from engaging in conduct that is prohibited under [MCL 750.411h, MCL 750.411i, or MCL 750.411s]. A court shall not grant relief under this subsection unless the petition alleges facts that constitute stalking as defined in [MCL 750.411h or MCL 750.411i], or conduct that is prohibited under [MCL 750.411s]. Relief may be sought and granted under this subsection whether or not the individual to be restrained or enjoined has been charged or convicted under . . . MCL 750.411h, 750.411i, and 750.411s[] for the alleged violation.

CNN contended in her petition that SEB's conduct violated MCL 750.411h. "Stalking" is defined by MCL 750.411h(1)(d) as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." "Course of conduct" is "a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose." MCL 750.411h(1)(a). "Harassment," in turn, is defined as

> conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress.

-5-

Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose. [MCL 740.411h(1)(c).]

MCL 750.411h(1)(e) defines "uncontested contact":

"Unconsented contact" means any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:

(i) Following or appearing within the sight of that individual.

(ii) Approaching or confronting that individual in a public place or on private property.

(iii) Appearing at that individual's workplace or residence.

(iv) Entering onto or remaining on property owned, leased, or occupied by that individual.

(v) Contacting that individual by telephone.

(vi) Sending mail or electronic communications to that individual.

(vii) Placing an object on, or delivering an object to, property owned, leased, or occupied by that individual.

We agree with SEB that the trial court misstated the law in rendering its judgment. The court stated:

The focus of today, besides the prior contact, and the [sic] between these parties is really the incident of August 8th. *And sometimes even a single incident can be - - can cause that* and in this instance we do have a history between these parties and words being exchanged. [Emphasis added.]

To enter a PPO under MCL 600.2950a, the court must find that the respondent engaged in a "course of conduct" "composed of a series of 2 or more separate" acts. MCL 750.411h(1)(a). And to meet the requirement of "harassment" under the statute, the court must find "repeated or continuing unconsented contact." MCL 750.411h(10(c). See also *Hayford*, 279 Mich App at 330. The court misstated the legal requirement for securing a PPO by characterizing a "single incident" as sufficient.

But the court did not *misapply* that provision of the law. Despite stating that the August 8, 2021 incident standing alone could support the entry of a PPO, the court articulated that SEB had engaged in several prior acts of harassment. The court noted that certain elements of the prior encounters could not be considered here and should be raised in separate civil matters. These elements included SEB and EB erecting a chicken wire fence in the driveway, placing "no parking" placards in the driveway, and cutting down CNN's and MN's inground basketball hoop. The court

-6-

acknowledged that CNN described SEB's threatening conduct during these past events and never suggested that that evidence would be excluded.

Despite applying the correct standard regarding past events between CNN and SEB, the court erred in granting a PPO based solely on SEB's statement, "[H]ere come your masser (sic)." MCL 750.411h(1)(c) provides that "[h]arassment does not include constitutionally protected activity . . . ." Imposing a PPO based on SEB's single, nonthreatening comment violated the First Amendment.

> A person has the right to freedom of speech under both the federal and state Constitutions, US Const, Am I; 1963 Const, art 1, § 5, and the domestic PPO statutory scheme specifically exempts from its reach the protected speech of those covered by an order, MCL 600.2950(1)(j); MCL 750.411h(1)(c). [*ARM v KLJ*, ___ Mich App ___; ___ NW2d ___ (2022) (Docket Nos. 357120, 358858, 358859), slip op 6-7.]

"The First Amendment protects the speech and association rights of an individual . . . no matter how different, unpopular or morally repugnant society may find his activities." *Shirvell v Dep't of Attorney General*, 308 Mich App 702, 732; 866 NW2d 478 (2015).

"There is no categorical 'harassment exception' to the First Amendment's free speech clause." *TM v MZ*, 326 Mich App 227, 240; 926 NW2d 900 (2018) (quotation marks and citation omitted). Yet "[t]he protections afforded by the First Amendment . . . are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution." *Virginia v Black*, 538 US 343, 358; 123 S Ct 1536; 155 L Ed 2d 535 (2003) (quotation marks and citations omitted). "The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id*. at 358-359 (quotation marks and citations omitted). The government may restrict and punish "fighting words"—words whose "very utterance inflict[s] injury or tend[s] to incite an immediate breach of the peace," or "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Id*. at 359 (quotation marks and citations omitted).

As in *TM*, 326 Mich App at 239, while SEB's comment was "undoubtedly in poor taste and offensive," it "did not reach the level of intending the commission of an unlawful act of violence," and CNN did not describe being threatened by the statement. " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 US at 359. By stating, "[H]ere come your masser (sic)," SEB did not threaten CNN, and the evidence does not support that she intended her words to generate violence. Rather, SEB boorishly expressed anger about a white neighbor interfering in her disagreement with CNN. Her words were racially charged, puerile, and ugly, but also were protected.

Moreover, although CNN reported being "nervous" later in the August 8, 2021 incident, the court did not find and the evidence does not support that her nervousness derived from SEB's comment. Rather, it was CNN's reaction to SEB and her family yelling at her and MN while they

spoke to the police. As an afterthought at trial, CNN described being "fearful about what happened on that date." Even so, CNN did not clarify what made her fearful.

CNN did testify that SEB made threatening motions toward her during this encounter. She described that SEB summoned her nephew, who arrived on the scene making threats. These allegations might have supported a finding of "harassment" as defined by MCL 750.411h. But the court's ruling indicates that the court did not consider these actions in entering the PPO. On remand, the court may consider whether evidence other than SEB's comment supports CNN's petition.

We vacate and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Jane E. Markey
/s/ Michelle M. Rick