STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2022 CA 0819

ROB GAUDET

VERSUS

SUSAN LALONDE

*Consolidated with*

NO. 2022 CA 0820

ROBERT GAUDET AND CAJUN RELIEF FOUNDATION, INC.

VERSUS

SUSAN LALONDE

Judgment Rendered: __APR 0 4 2023__

* * * * *

On Appeal from the
19th Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Trial Court No. 699976 c/w 700682

Honorable Richard "Chip" Moore, Judge Presiding

* * * * *

| | |
|---|---|
| Joshua P. Melder<br>Gregory T. Akers<br>Baton Rouge, LA | Attorneys for Plaintiff-Appellant,<br>Rob Gaudet |
| Mark D. Plaisance<br>Marcus J. Plaisance<br>Prairieville, LA<br>-and- | Attorneys for Defendant-Appellee,<br>Susan Lalonde |

A. Gregory Rome
Harry W. Ezim, Jr.
Baton Rouge, LA

\* \* \* \* \*

BEFORE:  THERIOT, CHUTZ, AND HESTER, JJ.

**HESTER, J.**

This is an appeal from a trial court judgment granting the mover's Louisiana Code of Civil Procedure article 971 special motion to strike and dismissing the Petition for Protection from Stalking or Sexual Assault filed against the mover.[1] For the following reasons, we affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

In 2016, Robert Gaudet, founded the Cajun Relief Foundation, Inc. (CRF) in order to coordinate volunteer search and rescue and other disaster relief in response to natural disasters. In August 2020, Gaudet and CRF prepared for the approaching Hurricane Laura. On August 27, 2020, Hurricane Laura made landfall in southwest Louisiana.

Susan Lalonde owned and operated Tia Juanita's Fish Camp, a restaurant located in Lake Charles, Louisiana. Lalonde made her restaurant available to CRF to serve as a base operation for coordinating Hurricane Laura relief efforts. CRF used Lalonde's restaurant to provide meals and coordinate other relief efforts in the Lake Charles community.

At some point, CRF left Lalonde's restaurant. On September 21, 2020, Gaudet texted Lalonde and asked if they could speak for a few minutes. Lalonde responded to his text informing him that because of the way CRF left her restaurant, particularly depleting the restaurant's inventory, she would have to close the restaurant. On September 22 and 23, 2020, Lalonde made Facebook posts on the "Tia Juanita's Fish Camp Lake Charles" Facebook page informing her patrons that the restaurant would be closed indefinitely. In the posts, she stated that she gave "the Cajun Navy" access to her restaurant, and "[b]ecause of the way they left [her]

---

[1] There undisputedly has been no sexual assault, and hereafter throughout the report, the motion is referred to as a Petition for Protection from Stalking.

3

restaurant," she had to make the "very difficult decision" to close the restaurant.[2] Thereafter, she responded to comments made by other Facebook members under her Facebook posts further discussing her frustrations with CRF and stating, among other complaints, that the goods people donated intended for the people of Lake Charles were being "hoarded and benefited by [Gaudet]."

On September 25, 2020, Gaudet filed a Petition for Protection from Stalking form naming Lalonde as the defendant and alleging that Lalonde stalked him under La. R.S. 46:2171 et. seq through false accusations in her texts and Facebook posts and by following him and members of CRF. In response to Gaudet's petition, Lalonde filed exceptions of no cause of action, vagueness, and ambiguity, which were sustained, and Gaudet was given thirty days to amend his petition. On February 2, 2021, Gaudet filed a supplemental and amending Petition for Protection from Stalking, attaching an addendum thoroughly detailing his complaints against Lalonde. He attached to the addendum copies of the texts and Facebook posts written by Lalonde. Lalonde again filed exceptions of no cause of action, vagueness, and ambiguity, which were denied.

Thereafter, Lalonde filed a Special Motion to Strike Petition for Protection from Stalking ... Pursuant to the Louisiana Code of Civil Procedure Article 971, contending that Gaudet's claims arise from statements and actions of Lalonde in furtherance of her right to free speech under the United States or Louisiana Constitutions in connection with a public issue. Lalonde requested that Gaudet's petition be dismissed with prejudice. Lalonde's special motion to strike came before the court for a hearing on January 10, 2022. After the hearing, a judgment was signed on February 7, 2022, granting Lalonde's special motion to strike, dismissing Gaudet's petition for protection from stalking with prejudice, and ordering Gaudet

---

[2] Lalonde refers to the CRF as "the Cajun Navy" in her Facebook posts.

4

to pay Lalonde attorney's fees in the amount of $3,000.00. It is from this judgment that Gaudet appeals, contending that the trial court erred in granting Lalonde's Article 971 special motion to strike.

## LAW AND ANALYSIS

Louisiana Code of Civil Procedure article 971 was enacted by the legislature as a procedural device to be used in the early stages of litigation to screen out meritless claims brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. **Thinkstream, Inc. v. Rubin**, 2006-1595 (La. App. 1st Cir. 9/26/07), 971 So.2d 1092, 1100, writ denied, 2007-2113 (La. 1/7/08), 973 So.2d 730. The intent of Article 971 is to encourage continued participation in matters of public significance and to prevent this participation from being chilled through an abuse of judicial process. **Lamz v. Wells**, 2005-1497 (La. App. 1st Cir. 6/9/06), 938 So.2d 792, 796. To this end, it is the intention of the legislature that Article 971 shall be construed broadly. **Davis v. Benton**, 2003-0851 (La. App. 1st Cir. 2/23/04), 874 So.2d 185, 190.

The right of free speech, however, is not unlimited. See **Near v. Minnesota**, 283 U.S. 697, 708, 51 S.Ct. 625, 625 75 L.Ed. 1357 (1931). The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. **Virginia v. Black**, 538 U.S. 343, 358-359, 123 S.Ct. 1536, 1547, 155 L.Ed.2d 535 (2003). The First Amendment permits a State to ban a "true threat." True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. **Virginia v. Black**, 538 U.S. at 359, 123 S.Ct. 1547.

5

Under Article 971, a cause of action against a person arising from any act in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitutions in connection with a public issue shall be subject to a special motion to strike unless the court determines that the plaintiff has established a probability of success on the claim. La. Code Civ. P. art. 971(A)(1). Accordingly, Article 971 provides a burden-shifting mechanism, whereby once the mover first establishes that the cause of action against her arises from an act by her in the exercise of her right of petition or free speech under the United States or Louisiana Constitutions in connection with a public issue, the burden then shifts to the plaintiff to demonstrate a probability of success on the claim. **Thinkstream, Inc.**, 971 So.2d at 1100.

A ruling on a special motion to strike is reviewed *de novo* on appeal to determine whether the trial court was legally correct. See **Roper v. Loupe**, 2015-1956, 2016 WL 6330407, at *3 (La. App. 1st Cir. 10/28/16). The appellate court gives no special weight to the trial court's findings, but exercises its constitutional duty to review questions of law and renders a judgment on the record. **Starr v. Boudreaux**, 2007-0652 (La. App. 1st Cir. 12/21/07), 978 So.2d 384, 388.

Since we review this matter *de novo*, we must examine the record and determine whether Lalonde's motion under Article 971 should have been granted. This review must first resolve whether the statements made by Lalonde fall under the protection of Article 971, *i.e.*, whether Lalonde's statements were made in a place open to the public or a public forum in connection with an issue of public interest.

A public issue is a matter of public interest or public concern. **Breen v. Holmes**, 2016-1591 (La. App. 1st Cir. 12/7/17), 236 So.3d 632, 636, writ denied, 2018-0049 (La. 3/2/18), 269 So.3d 708. Speech in relation to a matter of public concern is speech "relating to any matter of political, social, or other concern to the community." **Connick v. Myers**, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d

6

708 (1983).  Suits involving private disputes between private parties generally fall outside the ambit of Article 971.  **Shelton v. Pavon**, 2017-0482 (La. 10/18/17), 236 So.3d 1233, 1241.  To determine if speech is a matter of public concern, the court must consider the content, form, and context of the statements as revealed by the entire record.  See **Connick**, 461 U.S. at 147-148, 103 S.Ct. 1684.  The focus of the speaker's conduct should be the public interest.  Nevertheless, it may encompass activity between private people.  **Schittone v. Stoma**, 2017-1732 (La. App. 1st Cir. 5/2/18), 2018 WL 2078822 at *5 (unpublished *per curiam*), citing, **Cross v. Facebook, Inc.**, 14 Cal.App. 5th 190, 199, 222 Cal.Rptr.3d 250, 258 (Ct. App. 2017), review denied (Oct. 25, 2017).

Gaudet's amended petition contained copies of the entirety of Lalonde's statements on Facebook about Gaudet and CRF.  Lalonde's Facebook posts shared pictures of the state of her restaurant and said the following, in pertinent part:

- September 22 Facebook post
    - "It is with a Heavy Heart, I have to announce that Tia's will be closed indefinitely."
    - "Out of goodness of my heart, I gave access to my restaurant to Cajun Navy to serve our amazing community ... out of disrespect, they did not keep track of ...my inventory."
    - "I didn't realize that a non profit, such as Cajun Navy would cause me to make...the very difficult decision to close Tia's for now, or ever ... I would have to start partially from scratch to re-furbish and replenish what the Cajun Navy let go out of the door and didn't care to replace."
    - "Rob, (with the Cajun Navy, this particular branch) claiming he left the restaurant exactly the way he found it.  Even argued with Entergy when they were ready to hook us back up.  Told them he couldn't get the tech to unhook generator because it was a weekend.  He DEMANDED a meeting with me, BECAUSE HE WANTED TO GET HIS SUPPLIES OUT OF MY RESTAURANT.  The Generator was donated therefore he needed a few more days...as he had POSSESSION OF MY Restaurant and was not ready to hand it over.  He did offer me an assortment of can[ned] goods."

- September 23 Facebook post (the majority of this post was reposted as a comment to another Facebook user)
    - "this is what they did.  [H]elped themselves to what ever [sic] they could. ... let their volunteers muk [sic] thru [sic]overflowed toilets for 4 days.  Bar inventory gone ..."
    - "[w]atching him tonight ... bring box after box of donated goods[.] why were they not distributed???  Why do they have to sneak at night and

7

transport??? Why have these hundreds and hundreds of donated item [sic] in storage instead of in the hands of our citizens. Because NONE OF THE DONATED ITEMS will be used in Lake Charles. It will sold [sic] on "let go" or his web of Underground sales. Check it out Everyone."

- o "VOLUNTEERS ON EVERY STEP, RAISING BOX AFTER BOX OF DONATED GOODS IN ZEPHYR'S."
- o "Rob Gaudet went from My restaurant, storing and housing tons of donated goods at Gopher, having his wayward volunteers, check them out, guarding ... Look in the windows' [sic] Even had his seedy volunteers Sleeping in Gopher, to guard his stash. ... OUR PEOPLE NEED TO TAKE POSSESSION OF THESE SUPPLIES AND DISTRIBUTE TO THE ONES IT WAS INTENDED FOR."

- The following are comments made by Lalonde in reply to other Facebook users from approximately September 22 until October 22, 2020:
  - o "The sad truth to all of this, is there should be no stock of goods in this massive amount stockpiled by one individual to give or not give at his discretion. Think about it! People donated these goods to the citizens of Lake Charles to be given out immediately upon receipt. No one who donated expected their donation, paid for by working individuals, elderly, etc[.] to be hoarded and benefited by Rob Gaudet."
  - o "... the day after this post, they had 11 gofundme pages set up for my restaurant, and. You guessed it, 10 were not legitimate. Another way they rake in donations! They have No conscience, just greed. The wonderful people in Lake Charles needed the donations and help, the moment they were unloaded, not weeks later[.]"
  - o "... it was not the real 'cajun Navy' this guy is pulling off of 23 supposed charities, or non profits. None are legit. Cajun Navy [Foundation], cajun navy ground force, CN SEARCH & rescue, etc....he changes one word, adds on, and NONE ARE LEGITIMATE NON PROFITS. They are 'for profit' organizations. Pulling millions of dollars and supplies meant for our people who were [devastated] during the storm. The supplies donated were not for his business, it was meant for the citizens of Lake Charles immediately. Not 4 weeks later or never. After destroying my restaurant and I announced possible closing, I had 11 gofundme pages set up for the restaurant. Only one was legitimate gofund me helped close all pages with my name or my business. They were also pulling funds from there. ... The ONLY NON PROFIT HE HOLDS IS FOR 'CROWD RELIEF'. NOTHING TO DO WITH HURRICANE RELIEF OR DISASTER RELIEF."
  - o "The millions they rake in from their bogus Non Profits, and gofund me [sic]are real. Big money, lots of unscrupulous people with them. I Refuse to live under threats and 'cease & desist' orders, and threats of lawsuits for opening my mouth"
  - o "I agree!" (comment made in response to a comment posted by another Facebook user stating "He's a fraud & should be exposed.")
  - o "Pulling from 23 different charities that we know of. NONE ARE NON PROFIT. Who gives him the right to hoard supplies sent (donations) that people have sent to be given out immediately! Maybe he's psychic... HE KNEW DELTA WAS COMING!!! I HOPE SOMEONE STOPS HIM@"

o "Yes Mary, it has started..." (comment made in response to a comment posted by another Facebook user stating "This needs to be a criminal investigation.")

o "But...nothing is done[.] Just let them keep on rolling...."

In examining the content, form, and context of the speech at issue in this matter, in light of the whole record and keeping in mind the legislature's directive that the provisions of Article 971 are to be broadly construed, we find that although the speech in this case may encompass activity specifically between Lalonde and Gaudet and CRF, particularly how they left her restaurant, the speech at issue also arises from acts of Lalonde in furtherance of her right to free speech in connection with a public issue or issue of public interest. The context of Lalonde's Facebook posts addresses her concerns about how Gaudet was using monetary donations and goods donated by the public with the intention to be used by those in need after Hurricane Laura. This directly relates to a matter of social concern to the community. Also, as noted, a "true threat" means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual. Lalonde's statements in her Facebook post comment section that "I HOPE SOMEONE STOPS HIM," and responding yes to "[t]his need to be a criminal investigation" do not constitute "true threats" that are not protected by the first amendment right to free speech.[3] Therefore, we conclude that Lalonde carried her initial burden of establishing that the subject matter stems from actions relating to free speech in connection with a public issue. Accordingly, Article 971 applies,

---

[3] The statements made by Lalonde are clearly distinguishable from those made by the defendant in the recent case, **Terrell v. Derouen**, 2021-1327 (La. App. 1 Cir. 7/5/22), 345 So.3d 1065, wherein this court determined that a trier of fact could find that the statements made by the defendant constituted true threats of an intent to commit assault and/or battery, which would entitle plaintiff to a protective order from stalking. In **Terrell**, the defendant started his communications with the plaintiff by a text he sent to a Cajun Navy volunteer, "[Plaintiff]...if you watching this...you better run if you see me." The defendant followed the text with a Facebook post advising the plaintiff that "[you] clearly haven't paid attention well enough to know what kind of man I am." After that, in a series of Facebook posts, the defendant offered statements that he "punche[s]" those he believes "sucker punched" anyone he ever loved, and that he "will take down every ...single...person" that he determines has "ill intentions" toward the families affected by the Seacor Power tragedy. **Terrell**, 345 So.3d at 1071-1072.

9

and the burden shifted to Gaudet to establish the probability of success on his Petition for Protection from Stalking against Lalonde.

Gaudet petitioned the trial court for an order of protection from stalking, pursuant to La. R.S. 46:2171, *et seq.*, known as the Protection from Stalking Act ("the Act"). Under the Act, "stalking" means any act that would constitute the crime of stalking under La. R.S. 14:40.2 or cyberstalking under La. R.S. 14:40.3. See La. R.S. 46:2172; **Head v. Robichaux**, 2018-0366 (La. App. 1st Cir. 11/2/18), 265 So.3d 813, 816.

The offense of stalking is defined in La. R.S. 14:40.2 (A) as follows:

[T]he intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include but not be limited to the intentional and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or behaviorally implied threats of death, bodily injury, sexual assault, kidnapping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted.

The offense of cyberstalking is addressed in La. R.S. 14:40.3, and states in pertinent part, as follows:

A. For the purposes of this Section, the following words shall have the following meanings:

(1) "Electronic communication" means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature, transmitted in whole or in part by ... computer[.]

(2) "Electronic mail" means the transmission of information or communication by the use of the Internet, a computer, [or] a cellular telephone ... sent to a person identified by a unique address or address number and received by that person.

B. Cyberstalking is action of any person to accomplish any of the following:

(1) Use in electronic mail or electronic communication of any words or language ... for the purpose of extorting money or other things of value from any person.

10

(2) Electronically mail or electronically communicate to another repeatedly, whether or not conversation ensues, for the purpose of threatening, terrifying, or harassing any person.

(3) Electronically mail or electronically communicate to another and to knowingly make any false statement concerning death, injury, illness, disfigurement, indecent conduct, or criminal conduct of the person electronically mailed ... with the intent to threaten, terrify, or harass.

...

D. Any offense under this Section committed by the use of electronic mail or electronic communication may be deemed to have been committed where the electronic mail or electronic communication was originally sent, originally received, or originally viewed by any person.

E. This Section does not apply to any peaceable, nonviolent, or nonthreatening activity intended to express political views or to provide lawful information to others.

"Harassing" means the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures. See La. R.S. 14:40.2(C)(1).

In his petition, Gaudet alleges Lalonde stalked him under La R.S. 14:40.2 by "follow[ing] [him] in Lake Charles, Louisiana on or about September 23, 2020," and by "harass[ing] [him] through her pattern of conduct of knowingly publishing false criminal accusations about him on Facebook." Gaudet alleges Lalonde cyberstalked him under La. R.S. 14:40.3 by her Facebook posts and comments, which were electronic communications sent "for the purposes of threatening, terrifying and harassing [him]." In this matter, we have the benefit of all of the electronic communications made by Lalonde that Gaudet contends constituted stalking and cyberstalking. Since this evidence is in the record determining Gaudet's "probability of success" does not require this court to make assessments of credibility or resolve disputed issues of material fact.

Our review of the evidence reveals that the Facebook posts and text messages from Lalonde and the single allegation that she followed Gaudet would

11

not constitute the crime of stalking under La R.S. 14:40.2 or cyberstalking under La. R.S. 14:40.3. There was no evidence in the record proving that Lalonde made the Facebook posts or text messages for the purpose of extorting money or other things of value from Gaudet. She never requested money from Gaudet in the text or posts. The text message exchange was started by Gaudet requesting to speak with Lalonde. She responded stating that she was informing her employees that her restaurant would be closing because of missing inventory, stating, "I'm closing the doors. You have broken me." She also shared pictures of the restaurant and stated, "what a piece of shit you are…wow." Thereafter, one day later, Gaudet responded that he was talking to his attorneys about her Facebook post. There was no evidence that Lalonde texted Gaudet again. In the text messages and Facebook posts, Lalonde never threatened Gaudet, and the posts were not done for the purpose of terrifying Gaudet. Further, the texts Lalonde sent in response to Mr. Gaudet and the two Facebook posts as well as comments underneath simply do not rise to the level of harassment for cyberstalking. Additionally, having concluded that the Facebook posts and text messages would not constitute harassment, we further find that the Facebook posts and text messages considered with Gaudet's allegation of a single incident that Lalonde followed him do not constitute the crime of stalking. Stalking, by its very definition refers to the intentional and repeated following or harassing, and cannot consist of a single incident but rather must be recurring or renewed. See **State v. Jacks**, 2007-805 (La. App. 1st Cir. 11/2/07), 978 So.2d 922, writ denied, 2008-345 (La. 9/19/08), 992 So.2d 951. As we find that Gaudet did not and cannot show the probability of success on his petition for protection from stalking, we affirm the judgment of the trial court granting Lalonde's special motion to strike.

## CONCLUSION

For the foregoing reasons, the February 7, 2022 judgment of the trial court

12

is affirmed. All costs of the proceedings are assessed to plaintiff-appellant, Robert Gaudet.

**AFFIRMED.**